**FIRST DIVISION**
**September 7, 2010**

No. 1-09-2095

| | | |
|---|---|---|
| 520 SOUTH MICHIGAN AVENUE ASSOCIATES, d/b/a The Congress Plaza Hotel and Convention Center, | ) ) ) | Appeal from the Circuit Court of Cook County. |
| | ) | |
| Plaintiff-Appellant | ) | |
| | ) | |
| v. | ) | No. 06 L 050602 |
| | ) | |
| THE DEPARTMENT OF EMPLOYMENT SECURITY, an Administrative Agency in the State of Illinois; BRENDA A. RUSSELL, Director of Illinois Department of Employment Security; LOCAL 1, UNITE HERE, f/n/a/ Hotel Employees and Restaurant Employees International Union; et al., | ) ) ) ) ) ) ) ) | |
| | ) | The Honorable |
| | ) | Alexander P. White, |
| Defendants-Appellees. | ) | Judge Presiding. |

JUSTICE GARCIA delivered the opinion of the court.

Plaintiff 520 South Michigan Avenue Associates, doing business as the Congress Plaza Hotel & Convention Center (Congress Plaza), appeals from the decision of the Illinois Department of Employment Security and its Director (collectively, the Director) that its employees, striking since June 15, 2003, were "not ineligible" for unemployment benefits after the week ending July 5, 2003, a decision the circuit court confirmed. Congress Plaza contends the claimants remained ineligible under section 604 of the Illinois Unemployment Insurance Act (the Act), which provides a claimant is "ineligible for benefits for any

week his *** unemployment is due to a stoppage of work which exists because of a labor dispute." 820 ILCS 405/604 (West 2008). In a supplemental decision, the Director found that the "stoppage of work" ended July 5, 2003, because Congress Plaza had resumed substantially normal operations. Congress Plaza challenges this decision, contending a shortage of workers remained, its occupancy remained low, and it had to contend with a noisy, disruptive picket line, all of which preclude a finding that substantially normal operations had resumed.

The Director and the claimants, members of Local 1 UNITE HERE, the union representing the striking employees,[1] contend Congress Plaza's own admissions to the Department's written inquiries that it had suffered no curtailment in the operations of the hotel within two to three weeks after the start of the strike support the Director's decision, which is subject to

[1] Congress Plaza named all members of the striking "bargaining unit" of the union as defendants, but only about seventeen striking employees actually filed for unemployment benefits at the time of the Director's initial decision, making them claimants and the only union members that should have been named as defendants in the circuit court proceedings. See 56 Ill. Adm. Code §2720.1, amended at 21 Ill. Reg. 12129, eff. August 20, 1997 (a claimant is "a person who applies for benefits under the Act").

review for clear error. The Director and claimants argue that it was Congress Plaza's burden to establish the stoppage of work was ongoing by showing that its business continued to suffer significantly, a burden Congress Plaza failed to carry. We agree on all counts and affirm.

BACKGROUND

On June 15, 2003, members of Local 1 went on strike against the Congress Plaza Hotel & Convention Center. The union members were employed in various guest service positions such as housekeeper, laundry attendant, cook, steward, server, bartender, and bell attendant. The striking members represented between 130 and 185 of the approximately 220 individuals employed by Congress Plaza. The employees established a picket line outside the hotel that continued through at least July 15, 2004.

Shortly after the start of the strike, some of the union members filed for unemployment benefits. On June 18, 2003, Congress Plaza filed an eligibility protest with the Department pursuant to section 2720.130(a) of Title 56 of the Administrative Code (56 Ill. Adm. Code §2720.130(a), amended at 18 Ill. Reg. 16340, eff. October 24, 1994), contending the claimants were ineligible for unemployment benefits under section 604 of the Act because of the strike. On various dates thereafter, the Department made numerous inquiries of the hotel regarding the level of its business operations. Congress Plaza's director for human resources, Mark Souder, responded in writing to the

3

inquiries. Mr. Souder indicated 94 permanent employees were working at the hotel as of July 29, 2003. Congress Plaza was also using outside temporary workers to fill guest services positions as needed. Sixteen union members had crossed the picket line and returned to work at this point, and a total of twenty-seven did so by July 13, 2004.

In August 2003, the Department submitted a written inquiry to Mr. Souder: "Do you feel that the hotel's level of operation is substantially normal despite the strike?" On August 12, 2003, Mr. Souder responded, "Yes." In correspondence dated August 27, 2003, the Department asked the very same question, with a follow-up question, "If yes, why?" Mr. Souder responded, "Yes. All services normally provided for the guests are being provided." To the questions, "What is the extent of curtailment in operations? What is the percentage?" Mr. Souder responded, "None. 0%." To the question, "How many managers are being utilized and to what extent is [any] work being neglected?", Mr. Souder responded, "All the managers of the Hotel. No work is being neglected."

On September 23, 2003, and again on September 29, 2003, the Department, through Carolyn Vanek, mailed nearly identical correspondence to Mr. Souder to confirm its understanding of a telephone conversation Ms. Vanek had with Mr. Souder on September 22, 2003. Ms. Vanek reiterated that Mr. Souder had "estimated operations returned to 'substantially normal' within the *** two

4

to three week period" after the strike began.  In the September 29 correspondence, she informed the hotel, "To be clear, once operations are substantially normal, Section 604 of the Unemployment Insurance Act, which generally provides that striking or locked-out workers are ineligible for benefits, is no longer applicable."

Following the September 29 correspondence concerning the continued applicability of section 604, on September 30, 2003, Mr. Souder wrote to Cheryl Howard, manager of the Labor Dispute Unit at the Department, asserting, "Overall, 'operations' at the hotel have not returned to a 'substantially normal' level."  He explained his conflicting responses to the Department's written inquiries.  "[Ms. Vanek] did not define what she meant by these terms and I responded to them in the limited context of the questions she asked: i.e., guest service."  He asserted that Congress Plaza's business levels had suffered due to the strike and because of the disruption caused by the picket line.  He pointed to union literature boasting its action against the hotel had caused over $400,000 in lost revenue.

Claims Adjudicator

Following Congress Plaza's written protest that the claimants were ineligible for unemployment benefits under section 604, the claims adjudicator ruled on January 9, 2004, that the claimants were ineligible from June 15, 2003, through the week ending July 5, 2003, but "not ineligible" for any week

5

thereafter. The adjudicator determined that while the hotel was not operating at precisely the same level as before the strike, the hotel was running at substantially normal operation levels with the use of management personnel, service workers that had crossed the picket line, and temporary workers from four or five different agencies. Congress Plaza appealed the adjudicator's decision pursuant to section 800 of the Act. 820 ILCS 405/800 (West 2008). An administrative hearing was conducted pursuant to section 801 before the Director's representative. 820 ILCS 405/801 (West 2008).

## Director's Representative

At the administrative hearing beginning on July 13, 2004, Lucinda Scharbach, an organizer for the union, testified she spends 20 percent of her time trying to persuade potential guests not to patronize the hotel. In one "Strike Alert" she e-mailed an individual regarding an upcoming conference at the hotel and "strongly recommended" the individual inform conference guests of substandard conditions at the hotel and of the union's intentions to stage loud demonstrations during the conference. Ms. Scharbach participated in large demonstrations outside the hotel on Labor Day in 2003 and on June 16, 2004. Dan Miller, a lead union organizer, testified that since the strike began, demonstrations were held at the hotel on seven or eight occasions involving more than 100 individuals.

On behalf of Congress Plaza, Mark Souder testified that

picketing workers would sometimes use bull horns or bang drums outside the hotel.  The picket line typically included about 20 striking employees, but larger rallies would occur about once per month.  Mr. Souder testified customers would occasionally complain, and one guest sought "some sort of restitution from the hotel" for the inconvenience caused by one of the larger rallies. According to Mr. Souder, another guest complained to police that a union supporter had assaulted him.  Mr. Souder also testified that a hotel doorman complained that two striking employees had shouted racial epithets at him, which the union denied.

According to Mr. Souder, he had to devote a large amount of time in December 2003 to assist employees that had crossed the picket line when the union gave notice that their health insurance benefits were set to terminate at the end of the year. The highly publicized nature of the strike also triggered a large number of job applicants, requiring Mr. Souder to devote considerable time explaining that Congress Plaza was not hiring permanent replacements, but using temporary workers.  Mr. Souder conceded that his involvement with some of these matters fell within his job description and thus the work was not directly attributable to the strike.

Mr. Souder testified the high turnover among the temporary workers required him to spend time training new replacements.  He admitted, however, that the annual turnover of employees during the years leading up to the strike was also high, between 40% and

7

60%.

Mr. Souder testified that the temporary workers performed 50% to 75% of the work previously done by the striking employees. This meant that he, other managers, nonunion "line workers," and the returning strikers had to perform the rest. Managers were often required to perform line work, which was generally outside the scope of their jobs. The managers were generally required to do the line work when the hotel was fully occupied or the restaurant was especially busy. Mr. Souder testified that he worked up to two hours longer per day after the strike and worked more weekends than before. After the strike, he performed housekeeping functions six times. He answered phones for the housekeeping staff three or four times. He bussed tables one or two dozen times. He observed one restaurant manager serve almost "exclusively" as a bartender. He stated the food and beverage manager spent time serving food or bussing tables after the strike, but he told Ms. Vanek that this was probably true before the strike as well. He testified that clerical workers were performing guest service work in addition to their clerical duties.

Nonetheless, Mr. Souder confirmed the accuracy of his written responses to the written inquiries of the Department. As of September 9, 2003, all "work was getting done." He noted, however, the restaurant had to cut back some items from its menu and it might take longer to respond to requests from guests for

8

additional towels, an iron or the like.  Mr. Souder testified Congress Plaza had hosted at least 20 weddings since the start of the strike in June through the end of 2003, but had hosted only 6 weddings in the first six months of 2004.

Mr. Souder also sought to testify about his knowledge of the revenues of Congress Plaza, both before and after the strike.  Mr. Souder's knowledge was not first-hand, but predicated on business records, which the hotel refused to produce.  Congress Plaza claimed disclosure of the information was prohibited by confidentiality requirements of ongoing labor negotiations before the National Labor Relations Board.  Counsel for the claimants argued, however, that nothing prohibited the hotel from producing the business records.  The Director's representative ruled "there is no basis for the lack of presentation of [the hotel business] records" and, in their absence, barred Mr. Souder's testimony about Congress Plaza's revenue.

Shakeel Siddiqui testified he is the general manager of Congress Plaza, to whom all other managers report.  He lives at the hotel.  He testified that the three primary internet hotel booking Web sites had issued advisories warning potential guests of the strike at the hotel.  Since the start of the strike, he had cleaned rooms, parked cars, served in the dining room, poured drinks in the bar, and carried guests' bags to their rooms.  On cross-examination, he admitted to having parked cars only once.  While he initially claimed to have cleaned rooms "every single

day," he retracted that claim, stating he cleaned rooms no more than four days per week during some months and during other months he cleaned no rooms at all. He testified that since the start of the strike he worked 24 hours per day. Prior to the strike, Mr. Siddiqui would spend at least an hour per day comparing prices with competitors and working on hotel marketing. He was no longer able to do that after the start of the strike.

On September 1, 2005, the Director's representative issued a report recommending that the claimants be found ineligible for unemployment benefits from June 15, 2003, through the date of the hearing, July 15, 2004. The representative concluded that a work stoppage was ongoing at Congress Plaza and, contrary to the determination by the claims adjudicator, its business operations had not returned to substantially normal levels because Congress Plaza had relied on "extraordinary methods and abnormal operations, consisting of the use of management personnel, temporary agency workers, and line workers to do work normally done by" union employees. She found Congress Plaza had to rely on "the use of greater man-hours to maintain the same level of service, to the neglect of significant management duties."

Director's Decision

On May 25, 2006, the Director rejected the decision of the Director's representative, in favor of the decision by the claims adjudicator, finding the claimants were "not ineligible" for benefits for any week beginning after July 5, 2003. The

Director's written decision concluded that Congress Plaza had the burden to show that its business had not resumed substantially normal levels of operation and it had not met that burden. "Evidence concerning an employer's normal operations is a matter within the exclusive control of the employer. The employer has the burden of proving it." Congress Plaza did not produce the necessary evidence to support its contention. In her decision, the Director stated, "I conclude that the employer was able to resume substantially normal operations by July 5, 2003, by farming out much of the claimants' work to temporary service agencies."

On September 7, 2007, in the administrative review proceedings, the circuit court remanded the case to the Director with instructions to supplement her decision with specific findings of fact.

On June 4, 2008, the new Director issued a "Supplemental Decision." The Director affirmed the earlier decision. He found Mr. Souder worked no more than 1 additional hour during the strike relative to before, and Mr. Siddiqui's testimony that he worked 24 hours per day was beyond belief. He found both witnesses "evasive." The Director found "farming out work" through the use of temporary employees did not necessarily preclude a conclusion that the hotel had resumed substantially normal operations. The Director also noted Congress Plaza's refusal to document the extent of its use of temporary workers or

11

the extent to which its business revenues suffered.

On July 13, 2009, the circuit court issued a lengthy decision confirming the Director's decision. The court observed "there may be some leeway given to Mr. Souder's non-attorney status in answering" the Department's written inquiries regarding whether guest services had returned to normal operations following the start of the strike in June 2003. Nonetheless, it found "it is difficult to understand how, 'no work is being neglected' can somehow imply in any sense that [the hotel] had not returned to substantially normal operations."

This timely appeal followed.

ANALYSIS

We begin with the stated purpose of the Illinois Unemployment Insurance Act: "The general purpose of the Act is to provide compensation for those persons who are involuntarily unemployed." Bridgestone/Firestone, Inc. v. Doherty, 305 Ill. App. 3d 141, 147, 711 N.E.2d 799 (1999). The Act is to be "liberally construed" in the interest of eliminating "[p]overty, distress, and suffering." Huggins v. Board of Review, Department of Labor, 10 Ill. App. 3d 140, 143, 294 N.E.2d 32 (1973); 820 ILCS 405/100 (West 2008). The general purpose behind the Act is tempered by section 604 of the Act, which provides that a claimant is ineligible for benefits if his or her unemployment is "due to a stoppage of work which exists because of a labor dispute" at the claimant's employer. 820 ILCS 405/604. Section

12

604 "evinces the legislative determination that the State is to remain neutral in labor disputes and collective bargaining, rendering assistance to neither the employer nor labor." Local 7-641, Oil, Chemical & Atomic Workers International v. Department of Labor, 96 Ill. 2d 94, 98, 449 N.E.2d 134 (1983).

In 1953, our supreme court recognized that whether a "stoppage of work" arising from a labor dispute continues for purposes of ineligibility for unemployment benefits turns on whether " 'production or operation' " of the business has been diminished as a result of the labor dispute. Robert S. Abbott Publishing Co. v. Annunzio, 414 Ill. 559, 569-70, 112 N.E.2d 101 (1953), quoting the Nebraska Supreme Court in Magner v. Kinney, 141 Neb. 122, 130-31, 2 N.W.2d 689, 693 (1942). In Abbott Publishing Co., two distinct groups of claimants from the same employer were involved. The supreme court affirmed the Director's decision that for the "composing room employees" the "stoppage of work" ceased on the day the employer employed "the same number of workers *** normally employed prior to the time of the strike." Abbott Publishing Co., 414 Ill. at 563, 571. For the "mailing room employees," the stoppage of work ceased on the very day they joined the strike, because "they were fully replaced on the same day." Abbott Publishing Co., 414 Ill. at 571.

The central issue in this appeal is the Director's decision that the "stoppage of work" at the Congress Plaza, caused by the

13

strike on June 15, 2003, had ceased by July 5, 2003.  The "stoppage of work" test, to determine eligibility for unemployment benefits of employees that lost their work due to a labor dispute has been refined to require a finding that the employer has "return[ed] to substantially normal [business operations]."  Travis v. Grabiec, 52 Ill. 2d 175, 182, 287 N.E.2d 468 (1972).  If Congress Plaza had resumed substantially normal business operations after July 5, 2003, it is immaterial that a labor dispute continued to exist.  The Director's finding that the union members were "not ineligible" for unemployment benefits would be a matter of rendering assistance to prevent "poverty, distress, and suffering" (Huggins, 10 Ill. App. 3d at 143), and not of "rendering assistance to *** labor" (Local 7-641, Oil, Chemical & Atomic Workers International, 96 Ill. 2d at 98).

### Standard of Review

"The Unemployment Insurance Act provides that judicial review of the Director's decision must accord with the Administrative Review Law."  International Union of Operating Engineers, Local 148 v. Illinois Department of Employment Security, 215 Ill. 2d 37, 61, 828 N.E.2d 1104 (2005), citing 735 ILCS 5/3-101, et seq. (West 1994).  "Under the Administrative Review Law (735 ILCS 5/3-101 et seq. (West 2000)), we review the final decision of the administrative agency and not the decision of the circuit court."  Blessing/White, Inc. v. Zehnder, 329 Ill. App. 3d 714, 726, 768 N.E.2d 332 (2002).  In reviewing an

14

administrative decision, " '[t]he applicable standard of review depends upon whether the question presented is one of fact, one of law, or a mixed question of fact and law.' " Cinkus v. Village of Stickney Municipal Officers Electoral Board, 228 Ill. 2d 200, 210, 228 N.E.2d 200 (2008), quoting American Federation of State, County & Municipal Employees, Council 31 v. Illinois State Labor Relations Board, 216 Ill. 2d 569, 577, 839 N.E.2d 479 (2005).

The sides dispute the nature of the essential question presented in this case. Congress Plaza contends the Director's finding that business operations at the hotel had returned to a substantially normal level is a factual determination subject to review against the manifest weight of the evidence; whereas, the finding that the work stoppage ended by July 5, 2003, presents a question of law to be reviewed de novo, citing as authority the supreme court's decision in Local 148, 215 Ill. 2d 37.

The Director responds that the two questions Congress Plaza contends are presented by this case are not separate, but a single mixed question of law and fact. "It is *** improper, as some of the cases have done and as the Hotel attempts to do in its brief, to split apart 'mixed questions.' " The Director asserts his ultimate decision finding that the stoppage of work had ceased, as a mixed question, is reviewed under the clearly erroneous standard, citing Cinkus, City of Belvidere v. Illinois State Labor Relations Board, 181 Ill. 2d 191, 205, 692 N.E.2d 295

15

(1998), and <u>AFM Messenger Service, Inc. v. Department of Employment Security</u>, 198 Ill. 2d 380, 392, 763 N.E.2d 272 (2001). The claimants agree that a single mixed question of fact and law is presented by this case.

No deference is owed to an agency on a question of law, such as "an agency's interpretation of the meaning of the language of a statute," a question we review <u>de novo</u>. <u>Cinkus</u>, 228 Ill. 2d at 210 ("an agency's decision on a question of law is not binding on a reviewing court").

"An administrative agency's findings and conclusions on questions of fact are deemed <u>prima facie</u> true and correct." <u>Cinkus</u>, 228 Ill. 2d at 210. We disturb them only if "such findings of fact are against the manifest weight of the evidence." <u>Cinkus</u>, 228 Ill. 2d at 210.

In <u>City of Belvidere</u>, the supreme court "held for the first time that an examination of the legal effect of a given state of facts involves a mixed question of fact and law with a standard of review of 'clearly erroneous.' " <u>Cinkus</u>, 228 Ill. 2d at 211, quoting <u>City of Belvidere</u>, 181 Ill. 2d at 205. In other words, a mixed question of law and fact arises from an agency's decision that " ' "the [undisputed] rule of law as applied to the established facts is or is not violated." ' " <u>Cinkus</u>, 228 Ill. 2d at 211, quoting <u>American Federation of State, County & Municipal Employees, Council 31 v. Illinois State Labor Relations Board</u>, 216 Ill. 2d 569, 577, 839 N.E.2d 479 (2005), quoting

16

<u>Pullman-Standard v. Swint</u>, 456 U.S. 273, 289 n.19, 72 L. Ed. 2d 66, 80 n.19, 102 S. Ct. 1781, 1790 n.19 (1982).

The phrases "given state of facts" used by the supreme court in <u>Cinkus</u>, 228 Ill. 2d at 211, and "given set of facts" used in <u>City of Belvidere</u>, 181 Ill. 2d at 205, refer to findings of fact as determined by the administrative agency, which must stand unless "the opposite conclusion is clearly evident." <u>City of Belvidere</u>, 181 Ill. 2d at 204. Consistent with the deference owed to an agency's decision making, a mixed question is reviewed for clear error. <u>Cinkus</u>, 228 Ill. 2d at 211, citing <u>City of Belvidere</u>, 181 Ill. 2d at 205. "[A]n administrative agency's decision is deemed 'clearly erroneous' when the reviewing court is left with the ' "definite and firm conviction that a mistake has been committed." ' [Citation.]" <u>Cinkus</u>, 228 Ill. 2d at 211.

We reject Congress Plaza's suggestion that there is a difference, beyond mere semantics, between a "given state of facts" as the court stated in <u>Cinkus</u> and "undisputed facts" as the court stated in <u>Local 148</u>, such that the Director's decision here, that work stoppage ended by July 5, 2003, is subject to <u>de novo</u> review as the supreme court applied in <u>Local 148</u>. In its main brief, Congress Plaza states it "does not agree that the 'facts' relied upon by the second director are a 'given state of facts.' " We take from this that the Director's findings of fact

17

cannot constitute "undisputed facts" under Local 148.[2]  Thus, even if we were to agree that the standard of review holding in Local 148 has not been called into question by Cinkus, which we do not, the hotel's own contention makes Local 148 inapposite where its application of de novo review was based on "undisputed facts."  See Cinkus, 228 Ill. 2d at 211, ("We acknowledge that the distinction between [the] three different standards of review has not always been apparent in our case law)", citing Local 148, 215 Ill. 2d at 62.  We also question whether there is a distinction of any significance between a finding by the Director that "work stoppage" has ceased and a finding that substantially normal business operations have resumed in the context of this case, where neither side disputes that a "labor dispute" existed. In this sense, a " 'stoppage of work' ends when the employer's business operations return to a substantially normal condition." Be-Mac Transport Co. v. Grabiec, 20 Ill. App. 3d 345, 351, 314 N.E.2d 242 (1974), quoting Travis, 52 Ill. 2d at 182.  A finding that work stoppage has ceased flows from a finding that normal business operations have resumed.  The two are inextricably linked.  See Bridgestone, 305 Ill. App. 3d at 147 ("Whether [employer] resumed substantially normal operations so that the

_____

[2]  Both sides make clear that the findings of fact as determined by the Director based on the administrative proceedings below remain highly disputed.

18

'stoppage of work' ended is not purely a question of law").

We agree with the Director and the claimants that the ultimate decision that normal business operations had resumed, making the claimants "not ineligible" for unemployment benefits under section 604, is subject to clearly erroneous review. The findings and conclusions on questions of fact are subject to review based on the manifest weight of the evidence standard. Cinkus, 228 Ill. 2d at 210.

### Findings of Fact

The circuit court remanded the initial decision by the Director, directing that findings of fact in support of the decision be set forth. The new Director, following his re-examination of the record, issued a supplemental decision in which he made explicit findings of fact and conclusions of law.

The Director expressly found the two witnesses for Congress Plaza to be "evasive." The Director found Mr. Siddiqui's claim that he worked 24 hours a day during the strike to be unbelievable on its face. The Director found Mr. Souder's credibility to be "undermined by his frequent written and oral statements given to the Department before the hearing that the hotel had resumed substantially normal operations by July 5, 2003." The Director found Mr. Souder "vacillated" in his testimony regarding the percentage of work performed by management personnel that had previously been performed by the striking workers. The Director discounted the figures given by

Mr. Stouder because, in testifying by memory, "he frequently referred to information contained in hotel reports," which Congress Plaza refused to submit. The Director considered Mr. Souder's testimony regarding the percentage of work done by management personnel to be "uncorroborated opinion."

The Director ruled that Congress Plaza's use of large numbers of temporary workers did not preclude a finding that the hotel had resumed substantially normal operations. The hotel's reliance on the testimony of two of its managers alone was insufficient to demonstrate that its business continued to suffer significantly. The absence of any documentary evidence to support Congress Plaza's claim, in particular where Mr. Souder referenced reports detailing information the hotel failed to produce, undermined the trustworthiness of the manager's testimony. Ultimately, the Director concluded that Congress Plaza had not met its "burden of proving that it had not resumed substantially normal operations."

In the supplemental decision, the Director listed six reasons he did not agree with his representative's decision that Congress Plaza had not returned to substantially normal operations. Some of the reasons, summarized above, constituted findings of facts, others conclusions of law.

In challenging the Director's supplemental decision, Congress Plaza argues that each of the reasons given by the Director "for reversing the hearing officer's determination as

20

set forth in the Supplemental Decision" is contrary to the manifest weight of the evidence. Congress Plaza explains that, unlike the representative, the Director "was not even present to hear and observe testimony." The hotel urges that greater deference is owed to the decision by the Director's representative, as the individual that was "present at the hearing and heard and observed the witnesses, [who] found as fact that the hotel's Director of Human Resources, Mr. Souder, testified 'credibly.' "

Congress Plaza's overarching contention is that between the opposing decisions, the conclusion of the Director's representative that the hotel's ability "to maintain the same level of service" within two to three weeks after the start of the strike was due to an " 'abnormal means of operation' " is entitled to greater consideration by this court. To support this contention, Congress Plaza offers rebuttal arguments in its main brief to each of the reasons given by the Director for overturning the decision of the representative. In Gregory v. Bernardi, 125 Ill. App. 3d 376, 465 N.E.2d 1052 (1984), a very similar argument, that the decision of the administrative officer that hears live testimony should be given greater consideration on administrative review than the board that issues the final decision, was made and rejected.

The Gregory plaintiff argued "that the Board's decision is against the manifest weight of the evidence and that the ***

21

decision [of the referee who heard the witnesses and found in favor of the claimant] is supported by substantial evidence." Gregory, 125 Ill. App. 3d at 381. In rejecting this contention, the Gregory court explained:

> "In an unemployment compensation case, the court's function is limited to ascertaining whether the findings of the Board are supported by the manifest weight of the evidence; the court may neither substitute its own judgment nor overturn the Board's findings unless they are without substantial support in the record. [Citations.] Thus, whether the referee's decision is supported by substantial evidence is not relevant to this court's determination." Gregory, 125 Ill. App. 3d at 381.

Though the procedures for review of eligibility under section 604 are distinct from the procedures for ascertaining whether an individual claimant is eligible for unemployment benefits, the Board's position and the referee's position in Gregory are analogous to the Director and his representative in this case. 820 ILCS 405/800, 801 (West 2008). Both the referee and the Director's representative hear live testimony, while it is the Board's decision and the Director's decision that is subject to review under Administrative Review Law. See 735 ILCS

22

5/3-101 et seq. (West 2006); 820 ILCS 405/1100 (West 2006).

Congress Plaza's contention that deference is owed to the credibility determinations and the findings and conclusions of fact reached by the Director's representative in her decision is indistinguishable from the argument rejected in Gregory. See Starkey v. Civil Service Comm'n, 97 Ill. 2d 91, 100-01, 454 N.E.2d 265 (1983) ("there is no requirement *** that [the officer with the ultimate decision-making authority] rehear the evidence in order to reject [the hearing] officer's findings and recommendations").

We note the Director was under no legal obligation to support his decision to reverse the representative by giving explicit reasons for his disagreement, as opposed to issuing a decision based on his independent assessment of the record evidence. "[W]here an administrative agency and not the hearing examiner is responsible for the decision, the agency need not reverse only when the examiner's findings are 'clearly erroneous'; rather, the agency must make its own decision based on the evidence in the record." Gregory, 125 Ill. App. 3d at 381. Because it is the Director's decision that we review, we see no reason to explicitly address Congress Plaza's rebuttal arguments that the reasons given by the Director to reverse his representative's decision are contrary to the findings made by the Director's representative; the reasons for the Director's disagreement with his representative are "not relevant to this

23

court's determination." Gregory, 125 Ill. App. 3d at 381.

While we agree with Congress Plaza's position that the representative's report is part of the record (citing Gregory, 125 Ill. App. 3d at 380-81), we limit our consideration of the representative's report to ascertaining whether the Director's findings of fact are supported by the record. We decline the hotel's implicit invitation to compare the findings issued by the Director to the findings of the Director's representative and decide which is more in line with the record. It falls to the administrative agency to make "an independent assessment of the evidence in the record, rather than merely determining the supportability of the [hearing officer's] findings." Gregory, 125 Ill. App. 3d at 379. As confirmed by the circuit court's ruling below, it is only the Director's (supplemental) decision that we consider on administrative review. See Local 148, 215 Ill. 2d at 61.

To be clear, we give no deference to the representative's assessment of Mr. Souder's testimony as "credible." It fell to the Director, as the "ultimate finder of fact," to make his own assessment of the evidence on record, including assessing the credibility of the witnesses. Gregory, 125 Ill. App. 3d at 379. We reject any suggestion by Congress Plaza that the Director was bound to weigh the evidence in favor of the hotel, as his representative did. The assessment of demeanor and candor of a witness is particularly within the province of a finder of fact.

24

We find no basis to overturn the Director's negative assessment of the testimony offered by Mr. Souder and Mr. Siddiqui, the only witnesses presented by Congress Plaza, based on a contrary finding by the representative. Gregory, 125 Ill. App. 3d at 380-81; Starkey, 97 Ill. 2d at 100.

We will not substitute our judgment for that of the Director, nor is there any authority for substituting the judgment of the representative for the Director's. City of Belvidere, 181 Ill. 2d at 204 ("In examining an administrative agency's factual findings, a reviewing court does not weigh the evidence or substitute its judgment for that of an administrative agency").

We also expressly reject Congress Plaza's suggestion that explicit findings of fact can be shown to be against the manifest weight of the evidence by pointing to evidence in the record and the testimony of a hotel's witness's as given "without rebuttal," even if such evidence might be favorably seen as contrary to explicit findings:

> "For example, the Director of Human Resources, Mark Souder, testified without rebuttal that since the strike, he regularly attends frequent meetings with hotel officials discussing strike related issues where prior to the strike, no such meetings took place."

That the director for human resources was required to spend time on matters he would not otherwise have had to address in the absence of the labor dispute does not mean that the Director was obliged to find facts consistent with the hotel's claims that the strike occupied an inordinate amount of the manager's time. As Congress Plaza itself acknowledges, the testimony at the administrative hearing was highly contested; the resolution of contested testimony falls within the exclusive province of the ultimate finder of fact, which, in this case, is the Director.

An agency's findings of fact are "deemed prima facie true and correct." Cinkus, 228 Ill. 2d at 210. It falls to the party challenging an agency's findings of fact to demonstrate that they are against the manifest weight of the evidence. Gregory, 125 Ill. App. 3d at 381. If, on review, the issue "is merely one of conflicting testimony and credibility of a witness, the agency's determination should be sustained. [Citation.]" Gregory, 125 Ill. App. 3d at 383. We will not overturn an agency's findings of fact unless it is shown that "the opposite conclusion is clearly evident." City of Belvidere, 181 Ill. 2d at 204. That showing has not been made here. See Gregory, 125 Ill. App. 3d at 381 (Board's decision, reversing referee's decision in favor of claimant, upheld even though "two of its findings of fact have no basis in the record of the proceedings before the referee," thus violating the due process rights of the claimant as to those two findings).

26

Conclusion of Law

In the supplemental decision, the Director addressed the burden of establishing the continued applicability of section 604 at the administrative hearing: "Evidence concerning an employer's normal operations is a matter within the exclusive control of the employer. The employer has the burden of proving it." Whether the burden of proof fell on Congress Plaza raises an issue of law subject to de novo review. Czajka v. Department of Employment Security, 387 Ill. App. 3d 168, 173, 901 N.E.2d 436 (2008). Each party filed a supplemental brief on the issue of the nature of the burden of each party prior to oral argument, as we requested.

There is support for the position taken by the Director and the union that the employer carries a burden of proof under section 604: "Therefore, in the process of attempting to bring otherwise eligible claimants within the affirmative defense created by this specific exception [section 604] in the statute, the burden of proof should logically rest upon the employer." Be-Mac Transport Co., 20 Ill. App. 3d at 354.[3] Nonetheless, the supreme court has stated, in another context, that the burden of proof regarding the inapplicability of section 604 rests with the

------

[3] The court relied on its label of section 604 as an "affirmative defense" to conclude that the burden of proof rests on the employer, without providing any authority for imposing the label. Be-Mac Transport Co., 20 Ill. App. 3d at 354.

claimant. "To be eligible for unemployment insurance benefits under the relieving proviso of section 604, an employee must prove both that he is not directly interested in the labor dispute and that he is not of the same grade or class as employees who are participating in, financing or who hold a direct interest in the labor dispute." (Emphasis added.) Local 148, 215 Ill. 2d at 70; see also Shell Oil Co. v. Cummins, 7 Ill. 2d 329, 334, 131 N.E.2d 64 (1955) ("To relieve the employee of this ineligibility [imposed by the predecessor to section 604], it is incumbent upon him to prove, not one, but both of [the exceptions regarding lack of involvement in the labor dispute]").

In line with our supreme court's decisions, we believe the better approach to assessing the nature of the burden on the employer regarding the continued applicability of section 604 is that taken by the Fourth District in Bridgestone, which addresses the burden question in the context of a prima facie case. "In essence, *** [once] a prima facie case of eligibility for claimants [was established,] *** the burden of going forward shifted to Bridgestone ***." Bridgestone, 305 Ill. App. 3d at 150. Be-Mac Transport Co. can also be read as involving a prima facie case of eligibility when it addresses "the process of attempting to bring otherwise eligible claimants within the affirmative defense created" by section 604. (Emphasis added.) Be-Mac Transport Co., 20 Ill. App. 3d at 354. This was made clear by the court's ultimate conclusion. "[E]ven assuming that

28

the burden of proof rested upon claimants, we would be obliged to approve the ultimate finding of eligibility by the Director which rested necessarily upon the basic premise that unemployment during the disputed period existed because of unavailability of work." Be-Mac Transport Co., 20 Ill. App. 3d at 355.

In an administrative hearing under section 604, no shifting of the burden of proof occurs; the burden of proof remains on the claimants in accordance with the position taken by Congress Plaza before us. Local 148, 215 Ill. 2d at 70; Shell Oil Co., 7 Ill. 2d at 334.

In the instant case, once the claims adjudicator determined that Congress Plaza had resumed substantially normal business operations after July 5, 2003, the burden of going forward shifted to Congress Plaza to rebut the prima facie case that the claimants were "not ineligible" for unemployment benefits. Bridgestone, 305 Ill. App. 3d at 150. Congress Plaza recognized the logic of this and agreed to assume the burden of producing evidence at the administrative hearing it requested before the Director's representative as set out in the supplemental record filed after oral argument was heard in this case. 820 ILCS 405/804 (West 2008) ("the conduct of hearings and appeals shall be in accordance with regulations prescribed by the Director for determining the rights of the parties"); 56 Ill. Adm. Code S2725.250(b) (West 2008) ("At the hearing the petitioning employer must produce testimony, argument or other evidence to

29

establish that the *** determination and assessment is incorrect").[4]

As we noted, Congress Plaza does not challenge before us the Director's ruling as to its burden at the administrative hearing. We find it unnecessary to answer whether there is a practical difference in the instant case between failing to carry its burden of proof and failing to carry its burden of going forward. See Schiff v. Friberg, 331 Ill. App. 3d 643, 658, 771 N.E.2d 517 (2002) (once a prima facie case is made out, it falls to the finder of fact to assess the "credibility of the witnesses and *** [resolve the] conflicting evidence").  Ultimately, we do not read the Director's decision as turning on his reference to the term "burden of proof" as opposed to the burden of going forward. We follow the prima facie case analysis employed by the Fourth District in Bridgestone.  Bridgestone, 305 Ill. App. 3d at 150.

We agree with the Director that, in the context of this case, the burden to establish that substantially normal operations had resumed to overcome the claimant's prima facie case rested with Congress Plaza.

---

[4] The supplemental record reveals that at the administrative hearing before the Director's representative, Congress Plaza acknowledged its burden "to go forward;" the Director's representative described it as a burden of proof: the employer must "prove that the determination is incorrect."

Stoppage of Work

We now review the Director's ultimate decision that Congress Plaza had resumed substantially normal business operations by July 5, 2003, which we determined above involves a mixed question of law and fact, subject to review under the clearly erroneous standard. The issue can be restated as whether Congress Plaza overcame the prima facie case that the claimants were "not ineligible" under section 604. In this regard we begin with the negative inference the Director drew based on the lack of business records to corroborate the testimony of the witnesses on behalf of Congress Plaza. See Bridgestone, 305 Ill. App. 3d at 148-49 ("The employer's refusal to provide information to the Department with respect to the question of return to substantially normal operations is an appropriate factor to consider in determining the merits of the controversy").

Following an independent assessment of the record evidence, the Director noted:

> "Witnesses for the hotel as well as the hotel's attorney admitted that the hotel issued reports concerning the number of temporary workers hired during the strike, the hotel's occupancy rates before and during the strike, and the hours worked by management personnel during the strike."

The Director ruled that when Congress Plaza failed to produce the

reports or any other evidence documenting the alleged curtailment of business operations, the hotel failed to carry its burden. "I conclude that the hotel failed to show that it had not resumed substantially normal operations by July 5, 2003 because it did not sufficiently document the extent of its reliance on temporary help agencies and the extent of management personnel performing bargaining unit work during the strike." See Bridgestone, 305 Ill. App. 3d at 146 ("Bridgestone offered no evidence *** that production levels *** were substantially below what was needed").

Thus, we review the Director's decision that the work stoppage ceased as of July 5, 2003, against the backdrop that, according to the Director, Congress Plaza failed to come forward with sufficient evidence to establish the continued ineligibility of the claimants under section 604. We review the Director's decision, which presents a mixed question of fact and law, that Congress Plaza failed to demonstrate a "stoppage of work" continued past July 5, 2003, for clear error. Cinkus, 228 Ill. 2d at 211.

The only remaining challenge to the Director's decision made by Congress Plaza that we have yet to address is that "there is nothing in this record but speculation to conclude that transient workers who were repeatedly replaced were sufficiently up to speed in their work to return the hotel to normal conditions." Congress Plaza does not contest that an employer "farming out [its] work" does not preclude a finding that substantially normal

32

operations had resumed at the business. <u>Union Starch & Refining Co. v. Department of Labor</u>, 8 Ill. App. 3d 406, 411, 289 N.E.2d 692 (1972). Nor does Congress Plaza contend that the use of temporary workers constituted extraordinary methods to preclude a finding that substantially normal business operations had resumed.[5] See <u>Bridgestone</u>, 305 Ill. App. 3d at 148 ("To conclude that substantially normal operations had returned would mean that the employer did not need the striking employees"), citing <u>Travis</u>, 52 Ill. 2d at 182.

Congress Plaza's contention is that the facts do not warrant the factual conclusion that the temporary workers hired by the hotel, within three weeks after the start of the strike, "had supposedly learned all aspects of the jobs to efficiently replace long term striking employees." Congress Plaza argues that there is no evidence in the record "the Director may point to" of a

---

[5] Had Congress Plaza permanently replaced all of the striking workers, there is little doubt that the stoppage of work would have ceased. See <u>Abbott Publishing Co.</u>, 414 Ill. at 571 (the stoppage of work caused by the strike ceased when the employer permanently hired the same number of workers normally employed prior to the strike). Congress Plaza fails to inform why the use of temporary workers standing alone, in numbers it decides upon, should preclude a finding by the Director that substantially normal business operations had resumed.

change in circumstances from the first couple weeks after the strike, when the hotel was undoubtedly experiencing a "stoppage of work," to support his conclusion that the work stoppage had ceased by July 5, 2003.

While Congress Plaza's contention regarding the absence of any evidence showing a change of circumstances from June 15, 2003, the start of the strike, to July 5, 2003, is well taken, there are admissions in the record by Congress Plaza, which support the conclusion drawn by the Director that by July 5, 2003, Congress Plaza had resumed substantially normal levels of operation. "[T]his court will not substitute its judgment for that of the agency merely because other reasonable inferences could have been drawn from the evidence." Bridgestone, 305 Ill. App. 3d at 147, citing Golab v. Department of Employment Security, 281 Ill. App. 3d 108, 114, 666 N.E.2d 347 (1996).

While it is true that no specific documentary evidence exists to demonstrate a change in circumstances within three weeks after the strike, the record contains Mr. Souder's written responses to the Department's early inquiries regarding the level of Congress Plaza's business operations immediately after the strike. In written responses to the Department, Mr. Souder indicated that the hotel was using temporary workers to fill guest services positions as needed and 94 permanent employees were working at the hotel as of July 29, 2003. In his response to the August 2003 inquiry by the Department, "Do you feel that

34

the hotel's level of operation is substantially normal despite the strike?", Mr. Souder responded, "Yes." In correspondence dated August 27, 2003, the Department asked the very same question, with the follow-up question, "If yes, why?" Mr. Souder responded, "Yes. All services normally provided for the guests are being provided." To the questions, "What is the extent of curtailment in operations? What is the percentage?" Mr. Souder responded, "None. 0%." To the question, "How many managers are being utilized and to what extent is [any] work being neglected?", Mr. Souder responded, "All the managers of the Hotel. No work is being neglected."

That Congress Plaza later sought to limit the Department's reliance on these admissions is understandable, though we find that Mr. Souder's status as a nonattorney fails to undercut the reasonable import of his admissions; in any event, we cannot say that a fair reading of Mr. Souder's written admissions that there was no curtailment in Congress Plaza's operations, that no work was being neglected, and that all guest services were being provided, are at odds with the Director's decision.

We decline to engage in any reweighing of Mr. Souder's testimony to reconcile his early admissions with his later complaint that he misunderstood the intent of the questions when it was explained to him the information would be used in assessing whether the ineligibility under section 604 would continue. See Shell Oil Co., 7 Ill. 2d at 339 (Director's

35

finding will not be disturbed on review when evidentiary support exists for the decision).  The Director properly gave the admissions their "natural probative effect." Bridgestone, 305 Ill. App. 3d at 149 (newspaper articles, which referenced statements made by Bridgestone's officials that the employer was "resuming full production" and its "plant was running at full speed," supported Director's decision that Bridgestone had resumed substantially normal business operations).  We reject any suggestion by Congress Plaza that the weight the Director gave to the admissions is at odds with the record evidence.  See Slowik v. Schrack, 77 Ill. App. 3d 42, 45-46, 395 N.E.2d 753 (1979) ("credibility and weight of the evidence are normally matters left to the finder of fact").

The parties agree that under rule of law applicable to this case, "stoppage of work" ceases when the employer's business operations have returned to substantially normal levels.  The Director's conclusion that the "stoppage of work" had ceased beginning the week after July 5, 2003, "necessarily presupposes a finding that there was not sufficient evidence to invoke the statutory exception [based on a work stoppage due to a labor dispute.]"  Be-Mac Transport Co., 20 Ill. App. 3d at 354.

The burden of going forward to overcome the prima facie case that the claimants were "not ineligible" for unemployment benefits rested upon, and was assumed by, Congress Plaza.  The findings of fact by the Director amply support his decision that

the claimants were "not ineligible" under section 604. On the mixed question of fact and law, based on the record before us, we cannot say the Director's decision finding Congress Plaza had resumed substantially normal business operations for weeks ending after July 5, 2003, is clearly erroneous.

CONCLUSION

Based on the administrative record, we are not left with a definite and firm conviction that the Director made a mistake in finding the claimants "not ineligible" to receive unemployment compensation for weeks beginning after July 5, 2003, under section 604 of the Act, based on his finding that Congress Plaza had resumed substantially normal business operations by that date, the ongoing labor dispute notwithstanding.

We affirm the judgment of the circuit court confirming the decision of the Director.

Affirmed.

HALL, P.J., and LAMPKIN, J., concur.

## REPORTER OF DECISIONS - ILLINOIS APPELLATE COURT

**520 SOUTH MICHIGAN AVENUE ASSOCIATES, d/b/a the Congress Plaza Hotel and Convention Center,**
 **Plaintiff-Appellant,**

 **v.**

**ILLINOIS DEPARTMENT OF EMPLOYMENT SECURITY, an administrative agency in the State of Illinois, Brenda A. Russell, DIRECTOR OF ILLINOIS DEPARTMENT OF EMPLOYMENT SECURITY, LOCAL 1, UNITE HERE, f/n/a/ Hotel Employees and Restaurant Employees International Union, et al.**
 **Defendants-Appellees.**

### No. 1-09-2095

**Appellate Court of Illinois**
**First District, First Division**

**Filed: September 7, 2010**

**JUSTICE GARCIA delivered the opinion of the court.**

**HALL, P.J., and LAMPKIN, J., concur.**

**Appeal from the Circuit Court of Cook County**
**Honorable Alexander P. White, Judge Presiding**

**For PLAINTIFF-APPELLANT**

Bradley Wartman, Esq.
Peter Andjelkovich, Esq.
Peter Andjelkovich & Associates
39 S. LaSalle, Suite 200
Chicago, Illinois 60602

**For DEFENDANTS-APPELLEES**

N. Elizabeth Reynolds
Angie M. Cowan
Allison, Slutsky & Kennedy, P.C.
230 W. Monroe Street, Suite 2600
Chicago, Illinois 60602

Carl J. Elitz, Assistant Attorney General
Lisa Madigan, Attorney General,

1-09-2025

**State of Illinois**
**100 W. Randolph Street, 12th Floor**
**Chicago, Illinois 60601**

1-09-2025