# ILLINOIS OFFICIAL REPORTS

## Appellate Court

*Community Living Options, Inc. v. Department of Public Health*,
2013 IL App (4th) 121056

| | |
|---|---|
| Appellate Court Caption | COMMUNITY LIVING OPTIONS, INC., d/b/a BELLEFONTAINE PLACE, Plaintiff-Appellant, v. THE DEPARTMENT OF PUBLIC HEALTH; WILLIAM BELL, Acting Deputy Director of Public Health; TERESA GARATE, Assistant Director of Public Health; and DAMON T. ARNOLD, Director of the Department of Public Health, Defendants-Appellees. |
| District & No. | Fourth District<br>Docket No. 4-12-1056 |
| Rule 23 Order filed | October 24, 2013 |
| Rule 23 Order withdrawn | December 12, 2013 |
| Opinion filed | December 12, 2013 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | In an action arising from the death of a resident of plaintiff, an intermediate-care facility for developmentally disabled persons, as a result of an accident while she was being transported in a facility vehicle, the trial court's decision affirming the Department of Public Health's finding that plaintiff neglected the deceased patient when it did not supervise her while providing her with transportation services and failed to have written policies and procedures governing services it provided, including resident transportation, was upheld, the trial court's denial of plaintiff's motion to supplement the record was affirmed, and there was no basis for plaintiff's contention that the Department's Director could not reject the administrative law judge's findings and make an independent review and reach different conclusions. |

| Decision Under Review | Appeal from the Circuit Court of Sangamon County, No. 10-MR-648; the Hon. John Schmidt, Judge, presiding. |
| --- | --- |
| Judgment | Affirmed. |
| Counsel on Appeal | Jason T. Lundy (argued), Kathryn M. Stalmack, and Meredith A. Duncan, all of Polsinelli Shughart PC, of Chicago, for appellant. |
| | Lisa Madigan, Attorney General, of Chicago (Michael A. Scodro, Solicitor General, and Sharon A. Purcell (argued), Assistant Attorney General, of counsel), for appellees. |
| Panel | JUSTICE KNECHT delivered the judgment of the court, with opinion. Justices Turner and Steigmann concurred in the judgment and opinion. |

**OPINION**

¶ 1    In January 2009, defendants, the Illinois Department of Public Health, William Bell, Teresa Garate, and Damon T. Arnold (collectively, the Department), conducted an investigation concerning an automobile accident involving a resident who was under the care of plaintiff, Community Living Options, Inc., d/b/a Bellefontaine Place (Bellefontaine), an intermediate-care facility for the developmentally disabled. In April 2009, the Department sent Bellefontaine a notice of violations pursuant to the Nursing Home Care Act (Act) (210 ILCS 45/1-101 to 3A-101 (West 2008)). The Department's notice (1) alleged Bellefontaine committed (a) a violation of section 350.620(a) of title 77 of the Illinois Administrative Code (Code) (77 Ill. Adm. Code 350.620(a) (1989) (Intermediate Care of the Developmentally Disabled Facilities Code)) for failing to have written policies covering resident transportation, and (b) a violation of section 350.3240(a) of title 77 of the Code (77 Ill. Adm. Code 350.3240(a) (1991)) for the neglect of its resident; (2) determined the violations constituted a Type A violation of the Act (see 210 ILCS 45/1-129 (West 2008) (defining Type A violation)); (3) issued a conditional license; and (4) assessed a $20,000 fine pursuant to section 3-305(1) of the Act (210 ILCS 45/3-305(1) (West 2008)). An administrative law judge (ALJ) held a hearing on the violations and issued a report which recommended (1) the alleged section 350.620(a) violation be reduced to a Type B violation, (2) the alleged section 350.3240(a) violation be dismissed, and (3) the conditional license and fine be dismissed. In October 2010, the Department issued a final order, rejecting the ALJ's recommendation and affirming the violations and penalties as stated in the notice. In October 2010, Bellefontaine filed a complaint for administrative review, requesting reversal of the

-2-

Department's decision. In April 2011, Bellefontaine filed a motion to supplement the administrative record requesting documents from the period between the ALJ's report and the Department's final order. The circuit court denied the motion. In October 2012, the circuit court affirmed the Department's decision.

¶ 2      Bellefontaine appeals, arguing (1) the Department "lost jurisdiction" when it failed to make its violation determination pursuant to the 60-day time frame provided by section 3-212(c) of the Act (210 ILCS 45/3-212(c) (West 2008)); (2) the Department erroneously determined it violated sections 350.620(a) and 350.3240(a) of title 77 of the Code; and (3) the circuit court erred in denying its motion to supplement the record. We disagree and affirm.

¶ 3      I. BACKGROUND

¶ 4      Bellefontaine is a 16-bed intermediate-care facility for the developmentally disabled located in Waterloo, Illinois. Bellefontaine provides supervision, services, and a residence to developmentally disabled adults. The underlying events involve a 79-year-old female resident of Bellefontaine, whom we will refer to as R1. R1 had an intelligence quotient (IQ) of 51 and the functional equivalency of 6 years, 6 months. She had resided at Bellefontaine since 1988 and was diagnosed with mental retardation, cerebral palsy, speech and hearing impairment, and dementia.

¶ 5      A. The Automobile Accident

¶ 6      On December 3, 2008, Andrea Lockett, Bellefontaine's employee, was driving a facility van with R1 and two other residents, whom we will refer to as R2 and R3. The van had a driver's and passenger's seat in the front with a space between the two seats, and three bench seats in the rear. R3 sat in the front passenger's seat, R2 sat behind the driver's seat, and R1 sat in the middle of the first bench seat.

¶ 7      Lockett testified, at the administrative hearing, she observed seat belts across the residents' waists and heard them click. She asked if everyone's seat belt was fastened and everyone replied they were ready to go. Lockett testified Bellefontaine did not have a written policy specifying how she was to transport residents or ensure residents were securely fastened into their seats. Lockett drove to a day-training program where she dropped off R3. She stopped the van, removed the keys, and walked R3 in. Upon returning to the van, she visually checked R1's and R2's seat belts, which appeared to be fastened, and asked if they were ready to go. She then proceeded to drive to Belleville, Illinois, for R1's and R2's medical appointments. Approximately five minutes from their destination, a truck suddenly braked in front of her. Lockett braked to avoid the truck. R1 came forward and hit the dash with her head. R1 was transported to St. Elizabeth's Hospital in Belleville and she died the next day from the blunt trauma she sustained from the accident.

¶ 8      B. The Department's Investigation, Determination and Notice

¶ 9      On January 8, 2009, a Department investigator completed a survey investigation of the

accident. The investigator reviewed Bellefontaine's policies concerning its vehicles and resident transport, written statements, and Bellefontaine's interviews with R2 and Lockett.

¶ 10                              1. *The Survey Processing Log*

¶ 11    Jonathan Siegel, the Department's chief of the Division of Long-Term Care Field Operations, Quality Review Section, and acting chief of the Division of Quality Care Assurance, testified he determined two potential violations of the Department's regulations on February 23, 2009. He completed the Department's survey processing log on February 23, 2009, and the legal action form on the next day, February 24, 2009. The survey processing log includes computer-generated fields containing background information about Bellefontaine. The log shows a handwritten "2" next to the number of violations, and a "2" next to the Type A violation. The handwritten numbers contain Siegel's initials next to them and it is possible to see the "2" was written over a "1." The bottom section of the log contains handwritten comments, the reviewers' signatures, identification numbers, and the date "2/23/09." The comments state, "Comments reviewed. Violations cited."

¶ 12    The Department's legal action form reflected the assessment of fines and the imposition of a conditional license against Bellefontaine. When Siegel initially completed the form, he determined a $50,000 fine. Then on April 2, 2009, he changed the fine to $20,000 and amended the form to reflect two Type A violations.

¶ 13    At the hearing, Siegel explained the changes to the log and form. He testified it was a "shorthand method" to cite only one violation on the log, list the total fine on the form, and then break down the violations in the notice. However, pursuant to a circuit court ruling, Siegel determined he should identify violations separately. See *Rosewood Care Center, Inc. v. Illinois Department of Public Health*, Nos. 4-09-0463, 4-09-0516 cons. (Mar. 10, 2010) (unpublished order under Supreme Court Rule 23) (vacating the Sangamon County circuit court's judgment the Department's notice of violation to the licensee was not timely). He did this on April 2, 2009, when he changed the number "1" to "2" on both the log and form.

¶ 14                              2. *The April 9, 2009, Notice*

¶ 15    On April 9, 2009, the Department issued a notice as previously stated.

¶ 16                              C. The Administrative Proceedings

¶ 17    In June 2010, a Department ALJ held an evidentiary hearing. Lockett's and Siegel's testimony is summarized above. Additional testimony is summarized below.

¶ 18    James Haney, an investigator for Community Living Options, testified he assisted in the internal investigation. He concluded R1's seat belt became unbuckled during the trip and she came out of the seat when Lockett applied the brakes. An interview was conducted with R2 (R2 has an IQ of 40 and the functional equivalency of 6 years, 0 months, and is diagnosed with severe mental retardation, cerebral palsy, and dementia). In the interview, R2 stated she would assist buckling and unbuckling R1's seat belt as R1 could not do it for herself. R2 buckled R1's seat belt on the date of the accident. She did not unbuckle R1's seat belt. Haney

-4-

testified Bellefontaine, at the time of the accident, did not have a specific policy providing for employees to secure residents for transport.

¶ 19    Angela Wiley, Bellefontaine's adminstrator, testified she obtained Lockett's cell phone records, which indicated she was not on the phone when she applied the brakes. Wiley testified Bellefontaine had no facility policy mandating residents be belted prior to leaving the facility in a vehicle. However, it was the facility's practice for all residents to be secured in a seat belt prior to leaving.

¶ 20    Timothy Mills, Jr., an emergency paramedic, testified he spoke with R1 after the accident. She told him she was restrained but it felt loose.

¶ 21    Greg Elfrink's stipulated testimony stated he was Bellefontaine's maintenance director. He checked the van's seat belts on December 3, 2008. They were in working order.

¶ 22                    D. The ALJ's Report

¶ 23    In September 2010, the ALJ, John G. Abrell, issued a 23-page report and recommendations. The report includes a thorough review of the testimony and discussion of the law. The ALJ found (1) Bellefontaine's "Vehicle Maintenance Checklist" "contained a requirement to 'check belts to lock properly and for wear,' which was to be performed by maintenance staff on a weekly basis"; (2) R1's "seat[ ]belt sometimes had to be buckled and unbuckled"; (3) R1 told Mills, the paramedic, " 'she was restrained, but it felt very loose' "; (4) "no evidence was presented of any statutory or regulatory requirement mandating that passengers, other than front seat passengers, of a motor vehicle operated on a street or highway in this State wear a properly adjusted and fastened seat safety belt"; and (5) "no evidence was presented of any statutory or regulatory requirement mandating that nursing home staff secure, or assist in securing, nursing home residents in a properly adjusted and fastened seat safety belt."

¶ 24    On the alleged section 350.620(a) violation, the ALJ found, on the date of the accident (1) "there was no facility policy providing for employees to secure residents in the vans, to buckle their seat[ ]belts, when they were going to be transporting them"; (2) "it was the facility's practice that all residents be secured in a seat[ ]belt prior to leaving in the vehicle"; and (3) "transporting residents to appointments was a service provided to residents[,] although there was no written policy in place to insure that residents were securely fastened into their seats in the van." The ALJ found section 350.620(a) of title 77 of the Code required written policies and procedures. He did not agree "that failing to have a written policy rises to the level of a substantial probability of death or serious injury" to support a Type A violation.

¶ 25    On the alleged section 350.3240(a) violation, the ALJ stated, (1) the Department's neglect "allegations may arguably relate to supervision and oversight within the meaning of those definitions," but (2) neither the Act nor the Code contains a requirement for Bellefontaine's staff "to personally check residents' seat belts to insure they were properly adjusted and fastened." The ALJ found the Department had not established its neglect allegation.

¶ 26    The ALJ recommended (1) the alleged section 350.620(a) violation be reduced to a Type

-5-

B violation, (2) the alleged section 350.3240(a) violation be dismissed, (3) the $20,000 fine be dismissed, and (4) the conditional license be dismissed.

### E. The Department's Final Order

In October 2010, the Department issued its final order. It is signed by Garate. The final order included 16 "Additional Findings of Fact" and did not adopt the ALJ's conclusions of law. As relevant to this appeal, the order stated:

"15. On December 3, 2008, Respondent had no written policy in place for the safe transport of residents in violation of Section 350.620(a) of [title 77 of the Code].

\* \* \*

22. [Bellefontaine] had an unwritten practice of seat-belting residents in the van. That practice consisted of developmentally disabled residents putting on their own seatbelts or, if unable, having developmentally disabled residents assisted [*sic*] each other with their seatbelts and sometimes having staff assist residents.

23. [Bellefontaine] failed to provide adequate oversight and supervision over the residents it transported as defined by the Code when it allowed its employee to utilize the following safety measures: The facility driver simply listening for seatbelt 'clicks,' asking developmentally disabled individuals if they were securely belted in and possibly looking backwards to see if the belts were across their laps but not checking to make sure they were latched."

The order concluded the Department proved by a preponderance of the evidence Bellefontaine (1) committed a Type A violation of section 350.620(a) of title 77 of the Code "when it failed to have written policies and procedures governing all services provided by the facility," and (2) committed a Type A violation of section 350.3240(a) of title 77 of the Code "when it neglected R1." The order imposed the penalties as stated in the notice.

### F. The Circuit Court Proceedings

In October 2010, Bellefontaine filed a complaint for administrative review asserting the same arguments it makes on appeal. In April 2011, Bellefontaine filed a motion to supplement the administrative record. Bellefontaine argued the record did not contain any documents between the ALJ's September 10, 2010, report and the October 4, 2010, decision. Bellefontaine complained Garate "re-authored" the ALJ's report by using additional factual findings and a different legal analysis. In November 2011, the circuit court denied Bellefontaine's motion to supplement. In October 2012, the circuit court denied Bellefontaine's complaint for administrative review.

This appeal followed.

### II. ANALYSIS

Bellefontaine argues (1) the Department "lost jurisdiction" when it failed to make the violation determination pursuant to the 60-day time frame provided by section 3-212(c) of

the Act (210 ILCS 45/3-212(c) (West 2008)); (2) the Department erroneously determined it violated sections 350.620(a) and 350.3240(a) of title 77 of the Code; and (3) the circuit court erred in denying its motion to supplement the record. We address Bellefontaine's arguments in turn.

¶ 34                    A. The Act and Standard of Review

¶ 35       The Act was enacted to reform the nursing home industry amid concern of improper treatment of nursing home residents and established standards for the treatment and care of such residents. *Eads v. Heritage Enterprises, Inc.*, 204 Ill. 2d 92, 97, 787 N.E.2d 771, 774 (2003). To ensure compliance with the Act, the legislature invested the Department with expansive regulatory and enforcement powers. *Id.* A central component of the Act is the residents' " 'bill of rights,' " under which residents are guaranteed certain rights, including the right to be free from abuse and neglect. *Id.*; 210 ILCS 45/2-107 (West 2008) (neglect provision).

¶ 36       The Act defines a Type A violation as a violation of the Act or the Department's regulations "which creates a condition or occurrence relating to the operation and maintenance of a facility" that (i) creates a substantial probability that the risk of death or serious mental or physical harm to a resident will result therefrom or (ii) has resulted in actual physical or mental harm to a resident. 210 ILCS 45/1-129 (West 2008).

¶ 37       The Department's administrative decisions are subject to judicial review under the Administrative Review Law (735 ILCS 5/3-101 to 3-113 (West 2008)). 210 ILCS 45/3-320 (West 2008). Our review of the Department's administrative decision is governed by section 3-110 of the Administrative Review Law. 735 ILCS 5/3-110 (West 2008).

¶ 38       The appropriate standard of review is determined by whether the question is one of fact, one of law, or a mixed question of fact and law. Where an administrative agency's factual findings are reviewed, the reviewing court "will not reweigh the evidence or substitute its judgment for that of the agency." *Exelon Corp. v. Department of Revenue*, 234 Ill. 2d 266, 272, 917 N.E.2d 899, 904 (2009). "Rather, the court will only ascertain whether such findings of fact are against the manifest weight of the evidence." *Id.* "[A]n agency's conclusion on a question of law is reviewed *de novo*." *Id.* at 273, 917 N.E.2d at 904. Where the question is a mixed question of fact and law, the agency's conclusion is reviewed for clear error. *Id.*, 917 N.E.2d at 905. "An administrative decision is clearly erroneous when the reviewing court is left with the definite and firm conviction that a mistake has been committed." *Id.*

¶ 39                    B. Bellefontaine's Timeliness Claim

¶ 40       Bellefontaine argues the Department "lost jurisdiction" when it failed to make the violation determination pursuant to the 60-day time frame provided by section 3-212(c) of the Act (210 ILCS 45/3-212(c) (West 2008)). Bellefontaine contends the February 23, 2009, survey processing log is not the required violation determination. If we conclude the log is the required violation determination, Bellefontaine argues the Department's violation determination was not made final until April 2, 2009, when both the log and the legal action

taken forms were revised.

¶ 41                              1. *The Department's Jurisdiction*

¶ 42     As our supreme court has explained, "jurisdiction" in administrative law has three aspects: "(1) personal jurisdiction–the agency's authority over the parties and intervenors involved in the proceedings, (2) subject matter jurisdiction–the agency's power 'to hear and determine cases of the general class of cases to which the particular case belongs' [citation], and (3) an agency's scope of authority under the statutes." *County of Knox ex rel. Masterson v. The Highlands, L.L.C.*, 188 Ill. 2d 546, 553, 723 N.E.2d 256, 261 (1999) (quoting *Business & Professional People for the Public Interest v. Illinois Commerce Comm'n*, 136 Ill. 2d 192, 243, 555 N.E.2d 693, 716 (1989)). Bellefontaine's argument is not a question of personal or subject matter jurisdiction but one of whether the Department exceeded its authority under the Act.

¶ 43                         2. *Sections 3-212 and 3-301 of the Act*

¶ 44     Section 3-212 of the Act is titled "Inspection" and addresses the Department's inspection, survey, and evaluation of facilities governed by the Act. 210 ILCS 45/3-212 (West 2008). Section 3-212(c) of the Act provides as follows:

> "(c) Upon completion of each inspection, survey and evaluation, the appropriate Department personnel who conducted the inspection, survey or evaluation shall submit a copy of their report to the licensee upon exiting the facility, and shall submit the actual report to the appropriate regional office of the Department. *** Such report shall recommend to the Director appropriate action under this Act with respect to findings against a facility. The Director shall then determine whether the report's findings constitute a violation or violations of which the facility must be given notice. Such determination shall be based upon the severity of the finding, the danger posed to resident health and safety, the comments and documentation provided by the facility, the diligence and efforts to correct deficiencies, correction of the reported deficiencies, the frequency and duration of similar findings in previous reports and the facility's general inspection history. Violations shall be determined under this subsection no later than 60 days after completion of each inspection, survey and evaluation." 210 ILCS 45/3-212(c) (West 2008).

¶ 45     Section 3-301 of the Act is titled "Notice of violations," and provides as follows:

> "If after receiving the report specified in subsection (c) of Section 3-212 the Director or his designee determines that a facility is in violation of this Act or of any rule promulgated thereunder, he shall serve a notice of violation upon the licensee within 10 days thereafter. Each notice of violation shall be prepared in writing and shall specify the nature of the violation, and the statutory provision or rule alleged to have been violated." 210 ILCS 45/3-301 (West 2008).

¶ 46                                    3. *The April 9, 2009, Notice*

¶ 47        We briefly address Bellefontaine's assertion, in its statement of facts, the Department "made its determination of violation" on April 9, 2009, when it issued its violation notice. Recently, in *Aurora Manor, Inc. v. Department of Public Health*, 2012 IL App (1st) 112775, ¶ 11, 978 N.E.2d 287, the First District considered whether the violation notice is the same as the violation determination. The First District stated, "Equating the determination of a violation with the notice of violation would render the 10 days the Act allows to serve a notice of violation after making a determination a nullity." *Id.* Further, "the legislature clearly intended the determination of a violation and notice of violation to be separate events." *Id.* We agree with the First District's interpretation. To accept Bellefontaine's assertion the notice is tantamount to a determination, we would have to ignore the plain language of sections 3-212(c) and 3-301 and the procedures they envision. According to the plain language of the Act, (1) Department inspectors are required to submit a copy of their report to the licensee and the Department's appropriate regional office; (2) then, within 60 days of the report, the Director is to " 'determine whether the report's findings constitute a violation or violations of which the facility must be given notice' "; and (3) if such a violation determination is made, the Department is to serve the licensee with notice. *Id.* ¶ 12, 978 N.E.2d 287 (quoting 210 ILCS 45/3-212(c) (West 2008)). The statute intends three separate events, not two. We reject Bellefontaine's assertion the April 9, 2009, notice is the determination required by section 3-212(c) of the Act.

¶ 48                                  4. *The Survey Processing Log*

¶ 49        Bellefontaine contends the Department's determination was not made on February 23, 2009, because it "continued to change and revise its 'determination' of the violation" on the survey processing log, and its determination was "finalized" on April 2, 2009, when the Department changed the citation from one violation to two Type A violations. Bellefontaine's argument must fail based on both the plain language of section 3-212(c) of the Act and the evidentiary record.

¶ 50        To accept Bellefontaine's argument we must accept the propositions section 3-212 requires a *final* determination be made within 60 days, and this 60-day period is mandatory, not directory. Section 3-212(c) contains no express requirement a determination be final within the 60-day period. Further, Bellefontaine's argument the determination was not "finalized" until April 2, 2009, implicitly accepts a preliminary determination was previously made on February 23, 2009. To accept Bellefontaine's argument we would have to ignore that at the least a preliminary determination was made before the 60-day period expired. Regardless of whether section 3-212 requires a final determination within 60 days, we would also have to conclude the Department's tardiness has consequence. As our supreme court has explained, when considering whether a statutory provision is mandatory or directory, "we presume that language issuing a procedural command to a government official indicates an intent that the statute is directory." *People v. Delvillar*, 235 Ill. 2d 507, 517, 922 N.E.2d 330, 336 (2009). Bellefontaine has the burden to overcome this presumption. Two ways to overcome this presumption include (1) where the statute contains "negative language

prohibiting further action in the case of noncompliance" or (2) "when the right the provision is designed to protect would generally be injured under a directory reading." *Id.* Bellefontaine does not argue section 3-212 contains negative language preventing further action, what right it is designed to protect, or how such a right would be injured. Section 3-212 does not support Bellefontaine's argument.

¶ 51    In this case, Bellefontaine has offered no evidence to contradict the evidence the Department determined two violations on February 23, 2009. At the administrative hearing, Siegel testified he determined two violations on February 23, 2009. As he explained, he used a "shorthand method" for the log when he wrote a "1" next to the number of violations. He changed this method in response to a circuit court ruling and started identifying violations on the log separately. He did this on April 2, 2009, when he changed the number "1" to "2" on both the log and form. Bellefontaine offers no support for its assumption the Department cannot amend the log, or evidence to contradict Siegel's testimony he timely determined two violations on February 23, 2009.

¶ 52                    C. Bellefontaine's Section 350.620(a) Claim

¶ 53    Bellefontaine argues no factual or legal basis exists to conclude it violated section 350.620(a) of title 77 of the Code. Bellefontaine asserts (1) it had written policies and procedures relating to motor vehicles and drivers for the benefit and safety of its residents, namely its policy Nos. 5.14 and 5.21; and (2) neither the Act nor the Code establishes "what content is required for a facility's policies and procedures relating to vehicles and transportation," such as "the specifics of seat belt use, fastening, and verification."

¶ 54                    1. *Section 350.620(a) of Title 77 of the Code*

¶ 55    Section 350.620(a) of title 77 of the Code states:

"a) The facility shall have written policies and procedures governing all services provided by the facility which shall be formulated with the involvement of the administrator. The policies shall be available to the staff, residents and the public. These written policies shall be followed in operating the facility and shall be reviewed at least annually. (B)

b) These policies shall include:

* * *

6) A written statement for resident care services including physician services, emergency services, personal care and nursing services, restorative services, activity services, pharmaceutical services, dietary services, social services, resident records, dental services, and diagnostic service (including laboratory and x-ray)[.]" 77 Ill. Adm. Code 350.620(a), (b)(6) (1989).

¶ 56                    2. *Bellefontaine's Policy No. 5.14*

-10-

¶ 57       Bellefontaine's policy No. 5.14 states, "It is the policy of the facility to provide its individuals with clean and dependable transportation by maintaining its facility vehicles in good operating condition." This policy includes the requirements (1) "All facility vehicles must be used only by authorized staff members," (2) authorized drivers are required to provide a current driver's license, (3) "A pre-trip inspection shall be completed prior to all trips," (4) drivers must use "a backing assistant when making reverse movements in facility vehicles" (Bellefontaine's policy No. 5.37 addresses vehicle backing procedures), and (5) other maintenance-related items.

¶ 58       *3. Bellefontaine's Policy No. 5.21*

¶ 59       Bellefontaine's policy No. 5.21 states, "The facility will utilize Motor Vehicle Records to screen, train, and supervise employees to operate facility vehicles in a safe manner." The policy includes the requirements (1) employees transporting facility residents must have a driver's license, (2) a prospective employee's driving record will be reviewed before hiring, (3) driving records are reviewed annually, and (4) other items relating to authorized drivers.

¶ 60       *4. Bellefontaine's Compliance With Section 350.620(a)*
*of Title 77 of the Code*

¶ 61       Bellefontaine acknowledges policy No. 5.14 addresses "issues, such as cleanliness and backing assistance," and policy No. 5.21 requires the facility to use driving records to "screen, train and supervise employees to operate facility vehicles in a safe manner" rather than specifically addressing resident transportation services. Bellefontaine contends this should "not detract from those aspects of the policy to provide for the safe transportation" of its residents. Bellefontaine's argument is exactly what it criticizes the Department for doing in its interpretation of section 350.620–using a general to encompass a particular.

¶ 62       Section 350.620 of title 77 of the Code expressly requires a written policy for "all services" provided by a facility. 77 Ill. Adm. Code 350.620 (1989). In other words, if Bellefontaine provided a service to its residents then it needed to have a written policy governing the service. Bellefontaine offered transportation services to its residents, and the Department found Bellefontaine, on December 3, 2008, "had no written policy in place for the safe transport of residents." Bellefontaine's own administrator testified it had no written policy addressing residents' transportation. While Bellefontaine's policy Nos. 5.14 and 5.21 may generally address vehicle-related issues, these policies specifically address vehicle maintenance and use of driver's license records, not resident transportation. Bellefontaine did not comply with section 350.620 when it failed to have a specific written policy for resident transportation. Bellefontaine contends the Department's regulations are not precise enough to "inform facilities that their polices and procedures are deficient unless the facility has one to dictate the use and verification of seat belts during resident transportation." This fails to account for the Department's actual finding Bellefontaine had *no* written policy for resident transportation, and we need not determine whether section 350.620 requires a specific seat belt policy. The Department's finding is not against the manifest weight of the evidence.

¶ 63                        D. Bellefontaine's Section 350.3240(a) Claim

¶ 64        Bellefontaine argues no factual or legal basis exists to conclude it violated section
350.3240(a) of title 77 of the Code. As an initial matter, Bellefontaine contends the findings
were erroneous because "they were reached *sua sponte* by Assistant Director Garate who was
not present at the hearing, never observed the witnesses testify, and ignored the conclusions
made by the ALJ, who found that [the Department's] allegation of neglect was not supported
by the evidence presented at [the] hearing." On the merits, Bellefontaine contends the
violation "under a re-crafted theory of neglect" was unsupported because it was the
Department's "burden of proof to show that R1's seat belt was not fastened" and the
evidence showed it did not neglect R1.


¶ 65                1. *Director's Authority To Reject the ALJ's Recommendations*

¶ 66        Bellefontaine does not cite a single case, statute, or regulation in support of its contention
the Department's Assistant Director must defer to and cannot review and reject an ALJ's
report. This is for good reason. The Act authorizes the ALJ to act as a hearing officer to
conduct a hearing, make findings of fact, and submit a written report to the Director. 210
ILCS 45/3-707 (West 2008); 77 Ill. Adm. Code 100.15 (1994). Section 3-707 of the Act
requires the Director, or his designee, to "review the record and findings of fact before
rendering a decision." 210 ILCS 45/3-707 (West 2008). This restricts the Director's review
to the factual record before him and prevents him from making findings of fact not supported
by the record. However, no provision here requires deference be given to the ALJ's report
over the Director's decision. See *520 South Michigan Avenue Associates v. Department of
Employment Security*, 404 Ill. App. 3d 304, 316, 935 N.E.2d 612, 623 (2010) (noting the
administrative agency was "under no legal obligation" to give "explicit reasons" for rejecting
the ALJ's recommendation and issuing a decision based on its "independent assessment of
the record evidence"). Our supreme court has explained "it is not necessary that testimony
in administrative proceedings be taken before the same officers who have the ultimate
decision-making authority" (*The Homefinders, Inc. v. City of Evanston*, 65 Ill. 2d 115, 128,
357 N.E.2d 785, 791 (1976)), and where the decision is based upon a review of the evidence
presented to the hearing officer, no requirement mandates the administrative agency to
"rehear the evidence in order to reject its officer's findings and recommendations" (*Starkey
v. Civil Service Comm'n*, 97 Ill. 2d 91, 100-01, 454 N.E.2d 265, 269 (1983)). While
Bellefontaine prefers the ALJ's report, which is more favorable to it, it offers no reason to
conclude the Department cannot reject the ALJ's report. We find no support for
Bellefontaine's contention the Director, or Garate as his designee, could not reject the ALJ's
findings, make an independent review of the record, and reach different conclusions.


¶ 67            2. *Section 350.3240 of Title 77 of the Code and Related Definitions*

¶ 68        Section 350.3240(a) of title 77 of the Code provides, "An owner, licensee, administrator,
employee or agent of a facility shall not abuse or neglect a resident." 77 Ill. Adm. Code
350.3240(a) (1991).

¶ 69    Section 1-117 of the Act defines "neglect" as follows:

"a failure in a facility to provide adequate medical or personal care or maintenance, which failure results in physical or mental injury to a resident or in the deterioration of a resident's physical or mental condition." 210 ILCS 45/1-117 (West 2008).

¶ 70    Section 1-120 of the Act defines "personal care" as follows:

"assistance with meals, dressing, movement, bathing or other personal needs or maintenance, or general supervision and oversight of the physical and mental well-being of an individual, who is incapable of maintaining a private, independent residence or who is incapable of managing his person whether or not a guardian has been appointed for such individual." 210 ILCS 45/1-120 (West 2008).

¶ 71    Section 350.330 of title 77 of the Code defines "supervision" as follows:

"authoritative procedural guidance by a qualified person for the accomplishment of a function or activity *within his sphere of competence*, with initial direction and periodic inspection of the actual act of accomplishing the function or activity." (Emphasis added.) 77 Ill. Adm. Code 350.330 (2006).

¶ 72    Section 350.330 of title 77 of the Code defines "oversight" as follows:

"general watchfulness and appropriate reaction to meet the total needs of the residents, exclusive of nursing or personal care. Oversight shall include, but is not limited to, social, recreational and employment opportunities for residents who, by reason of mental disability, or in the opinion of a licensed physician, are in need of residential care." 77 Ill. Adm. Code 350.330 (2006).

¶ 73                    3. *Bellefontaine's Compliance With Section 350.3240*

¶ 74    Bellefontaine contends the Department's finding it violated section 350.3240 of title 77 of the Code is "unsupportable" because (1) it used a "re-crafted" theory of neglect, (2) the only evidence of any "failing" is the "mere fact" an accident occurred, and (3) section 12-603.1 of the Illinois Vehicle Code (Vehicle Code) (625 ILCS 5/12-603.1 (West 2008)) did not require rear passengers to be restrained in a seat belt. Bellefontaine's arguments are unpersuasive.

¶ 75    There is no support for Bellefontaine's contention the final order derives from a "re-crafted" neglect theory. As stated above, the statutory definition of "neglect" includes the requirement a resident be provided adequate "personal care" and therefore adequate "supervision" and "oversight." The Code elaborates "supervision" includes "authoritative procedural guidance *** for the accomplishment of a function or activity within [the resident's] sphere of competence." 77 Ill. Adm. Code 350.330 (2006). This regulation expresses the notion a facility resident is in a facility because he or she needs care, assistance, and guidance with activities other individuals may not require. The Code's definitions envision a facility (1) providing a resident with guidance and instruction on how to ride in a vehicle, including how to fasten a seat belt, if the resident, based on his or her sphere of competence, needs such guidance; (2) taking measures, such as visually inspecting and physically checking the seat belt is properly fastened and adjusted, to ensure the resident's

safety and well-being; and (3) periodically inspecting whether residents remain properly fastened and secured. See 77 Ill. Adm. Code 350.330 (2006). A facility's treatment of its residents must be considered in light of the residents' needs, not what might be expected of a nondevelopmentally disabled individual.

¶ 76 The Department concluded Bellefontaine neglected R1 because it failed to provide adequate oversight and supervision. The evidence showed (1) R1 was a developmentally disabled individual with the functional equivalency of a 6 1/2-year-old child; (2) Lockett did not fasten R1's seat belt; (3) R2, another developmentally disabled individual, said she fastened R1's seat belt; and (4) Lockett visually, but not physically, checked R1's seat belt when she returned from dropping R3 off. The Department's findings, as quoted above, showed this was consistent with Bellefontaine's unwritten practices. The findings show Bellefontaine's actions, on December 3, 2008, did not include (1) authoritative guidance on how to properly fasten or adjust a seat belt, (2) an initial determination by staff that residents were properly secured in their seats, or (3) periodic inspection the residents remained secured. Bellefontaine's suggestion it checked its residents' safety because staff visually inspected to see if the seat belt was fastened or heard the sound of a seat belt clicking together says nothing of whether the passenger is properly and safely secured–a seat belt, certainly a lap belt, could be fastened but not properly adjusted for the occupant. This is what Bellefontaine's neglect is based on, not its employee's attempt to avoid an accident. The Department's finding Bellefontaine neglected R1 when it did not supervise her when providing her transportation services is not against the manifest weight of the evidence.

¶ 77 Bellefontaine's assertion section 12-603.1 of the Vehicle Code is relevant to whether it neglected R1 is misguided. Bellefontaine's care of its residents is governed by the Act, which specifically guarantees residents are to be free from neglect, not the Vehicle Code. As the definition of "supervision" implies, what is required of Bellefontaine must consider the resident's functional abilities and competence, not whether the Vehicle Code requires rear passengers to use seat belts. Assuming *arguendo* the Vehicle Code has relevance, the Child Passenger Protection Act requires any person transporting a child 8 years of age and under to secure the child in a child restraint system and secure a child under the age of 16 in a seat belt. 625 ILCS 25/4, 4a (West 2008). Considering R1 had the functional equivalency of a 6 1/2-year-old child, these requirements should not be ignored in considering whether a facility has taken the appropriate measures to guard its residents' safety while providing transportation services.

¶ 78                    E. Bellefontaine's Motion-To-Supplement Claim

¶ 79 Bellefontaine contends the circuit court erred when it denied its motion to supplement the administrative record. Bellefontaine asserts (1) the administrative record is deficient because it "contains no materials, documents or information regarding the review and decision-making process by [Garate]"; (2) the Department admitted Garate engaged in impermissible *ex parte* communications when she consulted with Department ALJs; and (3) pursuant to section 10-60(c) of the Illinois Administrative Procedure Act (Administrative Act) (5 ILCS 100/10-60(c) (West 2008)) and section 100.19 of title 77 of the Code (77 Ill.

Adm. Code 100.19 (2010)), such communications are required to be in the administrative record.

¶ 80    Bellefontaine's argument is refuted by the plain language of the statutes and regulations. Section 10-35(a) of the Administrative Act requires the administrative record to contain "[a]ll staff memoranda or data submitted *** in connection with [the Department's] consideration of the case that are inconsistent with Section 10-60" and "[a]ny communication prohibited by Section 10-60." 5 ILCS 100/10-35(a)(7), (8) (West 2008). See also 77 Ill. Adm. Code 100.18(a)(7), (8) (2010) (same). Section 10-60(a) of the Administrative Act clarifies prohibited *ex parte* communications are those "in connection with any issue of fact." 5 ILCS 100/10-60(a) (West 2008). See also 77 Ill. Adm. Code 100.19(a) (2010) (same). Section 10-60(b) of the Administrative Act states "an agency member may communicate with other members of the agency, and an agency member or administrative law judge may have the aid and advice of one or more personal assistants." 5 ILCS 100/10-60(b) (West 2008). See also 77 Ill. Adm. Code 100.19(a) (2010) (same). Bellefontaine focuses on the first part of section 10-35 while seemingly glossing over the inconsistent-with-the-provisions-regarding-*ex-parte*-communications language. The wording of section 10-35(a) of the Administrative Act and section 100-18(a)(7) of title 77 of the Code is understandably confusing. Section 10-35(a)(7)'s language means one must determine if the "staff memoranda or data" submitted is inconsistent with section 10-60's *ex parte* communication restrictions. If it is, then it must be included. This is where Bellefontaine's argument fails. Section 10-60(b) expressly allows *ex parte* communications between the Department's members for purposes of aid and advice, and such communications are not required to be included in the administrative record. Further, section 10-60(a) defines prohibited *ex parte* communications as those in connection with factual issues. Bellefontaine fails to identify how Garate's consultation with Department ALJs and other communications involved in the "decision-making process" are connected with any issue of fact. All of the facts noted in the agency decision are taken from the record. Bellefontaine's contention the administrative record must contain communications relating to Garate's "decision-making process" is without merit.

¶ 81                                III. CONCLUSION

¶ 82    We affirm the circuit court's judgment.

¶ 83    Affirmed.