# Illinois Official Reports

## Appellate Court

---

### *Frances House, Inc. v. Department of Public Health*, 2015 IL App (1st) 140750

---

| | |
|---|---|
| Appellate Court Caption | FRANCES HOUSE, INC., d/b/a Kanthak House, Plaintiff-Appellee, v. THE DEPARTMENT OF PUBLIC HEALTH; THERESA GARATE, Assistant Director of Public Health; and DAMON T. ARNOLD, Director of Public Health, Defendants-Appellants. |
| District & No. | First District, Second Division<br>Docket No. 1-14-0750 |
| Filed<br>Rehearing denied | October 13, 2015<br>November 6, 2015 |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 11-CH-30059; the Hon. Peter Flynn, Judge, presiding. |
| Judgment | The Director's decision is affirmed. |
| Counsel on Appeal | Lisa Madigan, Attorney General, of Chicago (Laura Wunder, Assistant Attorney General, of counsel), for appellants.<br><br>Polsinelli PC, of Chicago (Jason T. Lundy and Paula S. Kim, of counsel), for appellee. |
| Panel | PRESIDING JUSTICE PIERCE delivered the judgment of the court, with opinion.<br>Justices Neville and Hyman concurred in the judgment and opinion. |

**OPINION**

¶ 1 Defendant Illinois Department of Public Health (Department) appeals from an order of the circuit court that reduced plaintiff Kanthak House's (Kanthak) violation of section 350.700(b) of Title 77 of the Illinois Administrative Code (Code) (77 Ill. Adm. Code 350.700(b), amended at 13 Ill. Reg. 19451 (eff. Dec. 1, 1989) (Intermediate Care of the Developmentally Disabled Facilities Code)) from a "Type A" classification to an administrative warning, and vacated the $5,000 fine and six-month conditional license. The Department argues that this court should affirm the Director's, Dr. Damon Arnold's, classification of Kanthak's violation as "Type A." For the following reasons, we reverse the circuit court but affirm the Director's classification of Kanthak's section 350.700(b) violation as a "Type A" violation and reinstate the $5,000 fine and six-month conditional license.

¶ 2                                      BACKGROUND

¶ 3 Kanthak, an intermediate care facility for the developmentally disabled, is licensed by the Department pursuant to the Nursing Home Care Act (Care Act) (210 ILCS 45/1-101 *et seq.* (West 2008)). The facility is located in Ottawa, Illinois and houses 16 residents. Intermediate care facilities for the developmentally disabled are licensed and regulated by the Department.

¶ 4 In 2009, a 59-year-old mentally disabled woman (hereinafter "R4") resided at Kanthak. On August 22, 2009, R4 shoplifted a 300-count bottle of aspirin during a shopping trip to Walmart with the Kanthak staff and other residents. The staff was unaware that R4 had shoplifted the aspirin until they discovered the bottle later that day in her possession. The bottle was taken away from R4 and stored in administrator Melissa Terry's office in an unlocked desk drawer. No facts indicate that the office door was locked.

¶ 5 Sometime on September 29, 2009, R4 went into the office, took out the aspirin bottle, and ingested about 100 pills. Terry was in the dining room assisting another resident at the time. No one else was in the office when R4 ingested the pills. R4 later told Terry that she had taken the pills. Terry called 911 immediately and R4 was taken to a local emergency room.

¶ 6 R4 was given activated charcoal, admitted to the intensive care unit (ICU), and monitored for poisoning by salicylates (the analgesic agents in aspirin). A toxic level of salicylate is above 30. R4's levels were monitored every two hours. R4's level was 21 upon arrival and rose to 25 two hours later. R4 suffered two seizures because of the metabolic disturbance caused by the aspirin: one partial seizure and one toxic-clonic seizure.

¶ 7 R4 gave different reasons to different people for taking the pills. She told Terry she had a headache. R4 told the treating hospital physician, Dr. Gueorguiev, that she had a headache, she wanted to kill herself, changed her mind and said she wanted to kill someone else, and that she wanted to return to her birthplace. Dr. Gueorguiev observed that R4 stated "she has everything you ask her for," and that her suicidal and homicidal thoughts were "questionable" and "cannot be very serious." He also concluded that "the rest of [R4's] chronic conditions have remained stable."

¶ 8 On October 1, 2009, R4 was discharged from the hospital and involuntarily admitted to the hospital's inpatient mental health unit. R4 spent six days there, after which she was released because her past psychiatrist, Dr. Glavin, reported that she was less depressed, and

was not suicidal or homicidal. R4 was then released back to Kanthak. Kanthak did not notify the Department of R4's incident or hospitalization.

¶ 9      On September 30, 2009, the day after R4 ingested the aspirin, Kanthak's safety committee had a meeting to address the cause of the incident. As a result of the meeting, the committee determined that "[m]edication will not be stored in an office," and that "[s]tolen items will be returned to the store immediately."

¶ 10      On December 11, 2009, the Department conducted its mandatory annual licensure survey of Kanthak. During the survey, Deborah Montgomery, the health care facility surveillance nurse responsible for investigating Kanthak, discovered that Kanthak failed to report the R4 incident to the Department. As a result of Kanthak's failure to report, on February 3, 2010, the Department issued a notice of violations pursuant to sections 1-101 to 3A-101 of the Care Act (210 ILCS 45/1-101 to 3A-101 (West 2008)). The Department's notice alleged that Kanthak violated: (1) section 350.620(a) of Title 77 of the Code, which requires facilities to have "written policies and procedures governing all services provided by the facility"; (2) section 350.700(b) of Title 77 of the Code, which requires facilities to notify the Department of serious incidents or accidents, with "serious" defined to include instances of "physical harm or injury"; (3) section 350.1060(e) of Title 77 of the Code, which requires facilities to develop and administer individualized programs for managing residents' behaviors; and (4) section 350.1210 of Title 77 of the Code which requires facilities to provide all services necessary to maintain residents' good health. 77 Ill. Adm. Code 350.620(a), 350.700(b), 350.1060(e), 350.1210, amended at 13 Ill. Reg. 19451 (eff. Dec. 1, 1989).

¶ 11      The violation notice classified Kanthak's infractions as "one or more Type A violations." A "Type A" violation is a violation of the Care Act or the Department's regulations "which creates a condition or occurrence relating to the operation and maintenance of a facility" that (1) creates a substantial probability that the risk of death or serious mental or physical harm to a resident will result therefrom or (2) has resulted in actual physical or mental harm to a resident. 210 ILCS 45/1-129 (West 2008). The specified statutory penalties for a "Type A" violation include a fine of at least $5,000, as well as automatic issuance of a conditional license for six months. 77 Ill. Adm. Code 350.282(a)(1)(A), (a)(2), amended at 13 Ill. Reg. 19451 (eff. Dec. 1, 1989). The Department assessed a $5,000 fine and placed Kanthak's license on conditional status for six months. Kanthak requested an administrative hearing.

¶ 12      On April 12, 2011, the parties appeared before an administrative law judge (ALJ). Prior to the start of the hearing, the Department withdrew the charged violation of section 350.1060(e). 77 Ill. Adm. Code 350.1060(e), amended at 13 Ill. Reg. 19451 (eff. Dec. 1, 1989). The Department submitted several exhibits, including R4's medical records relating to her September 2009 emergency room and follow-up care. Additionally, the Department entered Kanthak's internal "Policy 5.24" (Policy 5.24) into evidence. Policy 5.24 states that "[a]ny facility employee or agent who witnesses or suspects a violation of resident rights, abuse, or neglect, as well as injuries of unknown source shall immediately report the matter to facility management." The policy included "abuse" and "neglect" definitions.

¶ 13      Two witnesses testified at the hearing: Melissa Terry and Deborah Montgomery, the health care facility surveillance nurse who investigated Kanthak in December 2009. Deborah Montgomery testified on behalf of the Department. She had been a registered nurse since 1983 and was an employee of the Department at the time of the December 2009 inspection. She testified as to the R4 incident. She testified regarding R4's hospital records from the

September 29, 2009 emergency room trip and ICU admission, and her inpatient mental health care treatment and release back to Kanthak. She also testified as to Policy 5.24. Finally, she opined that based on her Kanthak investigation, Kanthak did not provide "what was needed to maintain the safety of the individual," "did not provide safety" related to the unsecured aspirin bottle, and "did not provide monitoring of a close enough nature to keep R4 safe."

¶ 14 Melissa Terry testified on behalf of Kanthak. She testified that at the time of the R4 incident, she was employed as the qualified mental retardation [*sic*] professional (QMRP) at Kanthak. She began working there in April 2009. R4 had lived at Kanthak since November 2000. Terry had become familiar with R4's behavior plan and "addressed [R4's] behaviors of throwing objects, hitting, and some other aggressive behaviors." She testified that R4 did go on the August 22, 2009 shopping trip to Walmart and that R4 shoplifted a 300-count bottle of aspirin on that trip. She testified that Kanthak confiscated the stolen aspirin bottle from R4 and stored it "in an office at the facility." Terry testified that on September 29, 2009, R4 told Terry that she ingested the pills and Terry called 911. Terry also testified to R4's September 29, 2009 emergency room trip and ICU admission, inpatient mental health care treatment, and release back to Kanthak. Terry testified that Policy 5.24 only applied when there had been a suspected violation of resident rights, abuse, neglect, or injury from an unknown source. She did not think that the R4 incident triggered the policy, and, therefore, the policy did not require reporting to the Department. She also testified that there was no need to report the R4 incident "[b]ecause there was no significant harm or injury caused to R4."

¶ 15 Kanthak also called Montgomery as a witness "as if under cross examination pursuant to §2-1102 of the Illinois Code of Civil Procedure (735 ILCS 5/2-1102)." She testified that "she was the only Department representative conducting the survey" of Kanthak. Montgomery testified that "she concluded that Kanthak[ ] did not follow its Policy 5.24" as to the R4 incident. She testified that after reading R4's discharge summary, she verified "that R4's physician indicated that R4 had a mild toxicity range as a result of her ingesting the aspirin" and "that she did not do an investigation into how much aspirin would need to be ingested for R4 to be in a severe toxicity range." She also testified that "R4's treating physician indicated that R4's levels never came to a danger zone and no treatment was required."

¶ 16 On July 11, 2011, the ALJ issued his report and recommendation. The ALJ found no violation of section 350.620(a) of Title 77 of the Code or section 350.1210 of Title 77 of the Code, but found that Kanthak violated section 350.700(b) of Title 77 of the Code because it failed to notify the Department of the incident that caused physical harm or injury to a resident. The ALJ found Kanthak's claims that R4 did not suffer sufficient harm or injury to trigger the regulation to be "disingenuous" and "unpersuasive." The ALJ found that the failure to notify the Department "prevented [it] from being able to conduct its own independent investigation," thus precluding it from potentially identifying issues and violations, making recommendations, or taking corrective action. The ALJ found that the violation constituted a "Type A" violation and recommended a $5,000 fine and issuance of a six-month conditional license.

¶ 17 On August 8, 2011, the Department's Director adopted the ALJ's report and entered a "Final Order" that assessed a "Type A" violation against Kanthak for the section 350.700(b) violation, levied a $5,000 fine against Kanthak, and imposed a six-month conditional license against Kanthak.

¶ 18    On August 24, 2011, Kanthak timely filed a petition for administrative review in the circuit court seeking reversal of the Department's order. Kanthak argued that it did not violate section 350.700(b) of Title 77 of the Code and that such violation did not amount to a "Type A" violation. After briefing and oral argument, the circuit court affirmed the Department's finding of a section 350.700(b) violation, but reversed the designation of the violation as "Type A" and remanded the matter to the Department to reclassify the violation in light of two considerations: (1) the perceived contradiction between Kanthak's Policy 5.24's reporting requirements and those in section 350.700(b); and (2) the effect of the 2010 statutory amendments to the Care Act.[1]

¶ 19    On November 16, 2012, on remand, the ALJ found that no contradiction existed between finding that Kanthak satisfied its own reporting requirements but failed to satisfy the reporting requirements in section 350.700(b) of Title 77 of the Code because section 350.700(b) "requires that the Department be notified of any serious incident or accident," with "serious" defined as "any incident or accident that causes physical harm or injury to a resident." 77 Ill. Adm. Code 350.700(b), amended at 13 Ill. Reg. 19451 (eff. Dec. 1, 1989). The ALJ further found "[t]his Tribunal's recommendation of a Type 'A' violation is premised upon Kanthak['s] interpretation and implementation of its Policy 5.24 which is the antithesis of the reporting requirements found in ICFDD Code Section 350.700(b)." The ALJ also found that "Kanthak['s] error was further compounded by interpreting harm as 'significant harm or injury' whereas ICFDD Code Section 350.700(b) only requires 'physical harm or injury.' " As for the "Type A" classification, the ALJ found that Kanthak took a narrow view of what must be reported under Policy 5.24. Compared to section 350.700(b), Policy 5.24's narrow reporting requirements give Kanthak virtually unlimited discretion to decide what to report. Because of this, the ALJ determined that Policy 5.24 " 'creates a condition *** relating to the operation and maintenance of a facility presenting a substantial probability that death or serious mental or physical harm will result therefrom.' " The ALJ also found that the amendments to the Care Act effective after July 1, 2010 did not apply here. The Department thereafter adopted the ALJ's addendum in its remand order. Kanthak again appealed to the circuit court.

¶ 20    Before the circuit court a second time, Kanthak renewed its challenge to the Department's violation classification, again arguing that its violation of section 350.700(b) of Title 77 of the Code did not rise to the level of a "Type A" or "Type B" violation. After briefing and oral argument, on February 10, 2014, the circuit court entered an order that: (1) reversed the classification of the reporting violation as "Type A" and removed the $5,000 fine; (2) held that the section 350.700(b) violation here was not a "Type A" or "Type B" violation; and (3) directed the Department to impose the only remaining sanction, an "administrative warning." The Department did not adopt the circuit court's orders and now appeals.

---

[1]On remand, the ALJ determined, and the parties agree here, that the July 2010 amendments to the Care Act and the related amendments creating and modifying the MR/DD Community Care Act (Pub. Act 96-339, § 1-101.05 (eff. July 1, 2010) (210 ILCS 47/1-101.05 )) and the ID/DD Community Care Act (Pub. Act 97-227, § 73 (eff. Jan. 1, 2012) (amending 210 ILCS 47/1-101)) were inapplicable and did not affect the assessed violation or penalty.

¶ 22     Before we address the merits of the Department's arguments, we must address the appropriate standard of review. In administrative review cases, "this court review[s] the Director's decision and not the decision of the ALJ or the circuit court." *Parikh v. Division of Professional Regulation of the Department of Financial & Professional Regulation*, 2014 IL App (1st) 123319, ¶ 19 (citing *Lindemulder v. Board of Trustees of the Naperville Firefighters' Pension Fund*, 408 Ill. App. 3d 494, 500 (2011)). The applicable standard of review "depends on the question presented." *Parikh*, 2014 IL App (1st) 123319, ¶ 19 (citing *Comprehensive Community Solutions, Inc. v. Rockford School District No. 205*, 216 Ill. 2d 455 (2005)). "When an issue of pure law is raised, we review *de novo*." *Parikh*, 2014 IL App (1st) 123319, ¶ 19 (citing *Village Discount Outlet v. Department of Employment Security*, 384 Ill. App. 3d 522, 525 (2008)). "When the issue raised is one of fact, we will only ascertain whether such findings of fact are against the manifest weight of the evidence." *Parikh*, 2014 IL App (1st) 123319, ¶ 19 (citing *Provena Covenant Medical Center v. Department of Revenue*, 236 Ill. 2d 368, 386-87 (2010)). Lastly, "[a] mixed question of law and fact is reviewed under the clearly erroneous standard." *Parikh*, 2014 IL App (1st) 123319, ¶ 19 (citing *Heabler v. Illinois Department of Financial & Professional Regulation*, 2013 IL App (1st) 111968, ¶ 17). A mixed question of law and fact is one " 'in which the historical facts are admitted or established, the rule of law is undisputed, and the issue is whether the facts satisfy the statutory standard.' " *Parikh*, 2014 IL App (1st) 123319, ¶ 19 (quoting *Pullman-Standard v. Swint*, 456 U.S. 273, 289 n.19 (1982)).

¶ 23     There is no dispute between the parties here that the question presented is a mixed question of law and fact and therefore the clearly erroneous standard should apply. We are in agreement because the question presented here is whether the facts satisfy the statutory standard for classifying a violation as "Type A."

¶ 24     The clearly erroneous standard of review lies between the manifest weight of the evidence standard and the *de novo* standard, and lends some deference to the agency's decision. *Lombard Public Facilities Corp. v. Department of Revenue*, 378 Ill. App. 3d 921 (2008). The Department's decision will be deemed clearly erroneous only where, upon review of the entire record, we are "left with the definite and firm conviction that a mistake has been committed." (Internal quotation marks omitted.) *AFM Messenger Service, Inc. v. Department of Employment Security*, 198 Ill. 2d 380, 393 (2001).

¶ 25     Kanthak does not dispute the finding that it violated section 350.700(b) of Title 77 of the Code here. The only question before us is whether Kanthak's violation is properly classified as a "Type A" violation. A "Type A" violation is as follows:

> "[A] violation of the [Care] Act or the Department's regulations 'which creates a condition or occurrence relating to the operation and maintenance of a facility' that (i) creates a substantial probability that the risk of death or serious mental or physical harm to a resident will result therefrom or (ii) has resulted in actual physical or mental harm to a resident." *Community Living Options, Inc. v. Department of Public Health*, 2013 IL App (4th) 121056, ¶ 36 (citing 210 ILCS 45/1-129 (West 2008)).

¶ 26     Here, the ALJ found that Kanthak failed to report the R4 incident and thus violated section 350.700(b) of Title 77 of the Code, which requires facilities to notify the Department of serious incidents or accidents, with "serious" defined to include instances of "physical harm or injury." The Department adopted this finding and decided that a "Type A" penalty

was appropriate. Clearly, it would be preferable that the Care Act set forth the range of penalties in a more straightforward manner such that questions similar to what we have considered can be minimized in the future. That stated, we find the Department was within its authority in the imposition of the "Type A" penalty.

¶ 27 Applying the essentially undisputed facts of this case and the violation of section 350.700(b), which is not contested by Kanthak, to the statutory definition of a "Type A" offense, the Director's finding can be summarized as: Kanthak's implementation and interpretation of its duty to report under Policy 5.24, as required by section 350.700(b) of the Code, resulted in a failure to report to the Department that a resident gained access to an unsecured desk in the facility, ingested over 100 pills necessitating an emergency 911 call resulting in immediate medical intervention and admission to the ICU. Kanthak's implementation and interpretation of its policy is a condition relating to the operation of the facility that creates a substantial probability that the risk of death or serious physical harm will result to a resident is a "Type A" violation under the Care Act. This finding is not manifestly erroneous. We are cognizant of the fact that the failure to report the R4 incident did not *per se* cause R4 to ingest 100 aspirin pills resulting in her admission to the ICU, clearly a dangerous circumstance that resulted in physical harm to R4. However, Kanthak's interpretation of its duty to report, as dramatically demonstrated by the R4 incident which includes its failure to report, as found by the Director, "prevented [the Department] from being able to conduct its own independent investigation," thus precluding the Department from potentially identifying issues and violations, making recommendations, or taking corrective action which is a condition that creates a substantial probability that the risk of death or serious harm to Kanthak residents will occur in the future because the Department will be unaware and unable to take remedial action to prevent a reoccurrence. Common sense dictates that, where there is a failure to report a serious incident like the one involving R4, there is a substantial probability that future serious incidents will not be reported. For these reasons, we are not convinced that the Director's decision to categorize Kanthak's section 350.700(b) violation as a "Type A" violation was clearly erroneous. After reviewing the record before us we are not left with a definite and firm conviction that a mistake has been committed. See *AFM Messenger Service, Inc.*, 198 Ill. 2d at 393.

¶ 28                                                  CONCLUSION
¶ 29 For the above reasons, we reverse the circuit court but affirm the decision of the Director finding that Kanthak's section 350.700(b) violation was a "Type A" offense and affirm the corresponding penalties.

¶ 30 The Director's decision is affirmed.