2024 IL App (1st) 231176-U

No. 1-23-1176

Order filed September 13, 2024

Fifth Division

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| | | |
|---|---|---|
| LINDA KANE, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellant, | ) | Cook County. |
| | ) | |
| v. | ) | |
| | ) | No. 23 L 50068 |
| THE DEPARTMENT OF EMPLOYMENT SECURITY, | ) | |
| THE DIRECTOR OF EMPLOYMENT SECURITY, THE | ) | |
| BOARD OF REVIEW, and I CAN DREAM CENTER, | ) | Honorable |
| | ) | Daniel P. Duffy, |
| Defendants-Appellees. | ) | Judge, presiding. |

JUSTICE ODEN JOHNSON delivered the judgment of the court.
Presiding Justice Mikva and Justice Navarro concurred in the judgment.

**ORDER**

¶ 1    *Held*:   Where plaintiff voluntarily left her employment without good cause attributable to her employer, the Board of Review's denial of unemployment benefits is affirmed.

¶ 2    Plaintiff Linda Kane appeals *pro se* from an order of the circuit court of Cook County affirming a final administrative decision by defendant, the Board of Review of the Department of Employment Security (Board). The Board found that plaintiff left her employment voluntarily

without good cause attributable to her employer and, thus, was ineligible for unemployment insurance benefits. On appeal, plaintiff challenges the denial of benefits contending she did not quit her job but, instead, was fired by her employer. For the following reasons, we affirm.

¶ 3    The record shows plaintiff was employed as a part-time special education teacher with the iCan Dream Center (Center) from September 23, 2021, until February 1, 2022. On February 6, 2022, plaintiff applied to the Department of Employment Security (Department) for unemployment insurance benefits. Plaintiff reported that her reason for separation was because she had been "discharged (fired)" by her employer.

¶ 4    The Center protested plaintiff's claim for benefits. Dr. Evisha Ford, executive director of the Center, submitted a written response to the Department stating plaintiff had "resigned in lieu of termination then changed her mind to access unemployment benefits." Ford further stated that there had been substantive cause to terminate plaintiff, whose conduct had been "egregious."

¶ 5    Ford attached three documents to the Center's written protest: (1) plaintiff's remediation plan; (2) plaintiff's performance review; and (3) a severance of employment letter. In the remediation plan, dated December 2, 2021, plaintiff's supervisor, Tateanna Foster, indicated that plaintiff's attitude and conduct had been unsatisfactory. Foster stated that plaintiff had undermined team morale, negatively impacted the organizational culture, and compromised the program's reputation with superfluous comments she directed towards staff, parents, and students. The plan indicated that follow-up action was needed including internalizing skills taught in behavior management trainings and utilizing the "THINK" strategy when communicating with staff and parents. Plaintiff was required to comply with the follow-up action by February 2, 2022. The

remediation plan explicitly stated, "[w]e want you to remain employed at this program, but failure to correct deficiencies may result in termination of employment."

¶ 6    The remediation plan also included a handwritten note added by Ford following a meeting she and Foster had with plaintiff on February 1, 2022. Ford noted that plaintiff had stated at the meeting that she had "not been happy in months" and did not feel the teachers were respected. Ford also noted that plaintiff stated that she did not agree with her evaluation and, therefore, spent no time reflecting on it to implement change. Ford further noted that plaintiff commented that it was "her 'lucky day' prior to resigning her role."

¶ 7    Plaintiff's performance review, completed by Foster on December 13, 2021, indicated that plaintiff met nearly all the Center's expectations but was unsatisfactory regarding her planning for a positive classroom environment and promptly responding when issues arose using best practices and collaboration. Foster made several positive comments but noted plaintiff needed improvement with not taking the students' words and behaviors personally, giving parents feedback that was solution-based and supportive, and creating a positive environment in her classroom and with her staff members. Foster commented on the review form that she looked forward "to the continuous growth you will have in this position." Foster noted that plaintiff refused to sign the remediation plan to acknowledge she had received it.

¶ 8    The severance letter, dated February 2, 2022, was signed by Ford. The letter stated its purpose was to memorialize their February 1 meeting where the "mutual decision" was made to sever plaintiff's employment. The letter detailed how plaintiff had failed to meet the requirements of the remediation plan. It also noted that plaintiff had stated in their meeting that she spent no time reflecting on the plan to make changes because she did not agree with the plan. In the letter,

Ford stated, "[u]pon explaining that you failed to meet the expectations within the remediation plan you stated that you have not been 'happy here in months and would happily resign.' I am in complete agreement with that decision." Ford further noted, "[y]ou also stated that this was 'the happiest day of your life.' "

¶ 9     A Department claims adjudicator conducted an initial telephone interview with plaintiff to assess her eligibility for benefits. During the interview, plaintiff stated that she left her employment at the Center because she was terminated. Plaintiff stated that, during the February 1 meeting, Ford asked her if she had reflected on her remediation plan. Plaintiff told Ford that she did not give it a second thought. Ford then began discussing how plaintiff related to other people. Plaintiff told the claims adjudicator, "I told her if she was trying to get rid of me, don't waste her time." Plaintiff claimed Ford then said that was "what she was going to do," and plaintiff responded that it was the happiest day of her life. Ford told plaintiff to get her belongings and leave, which she did. Thereafter, plaintiff received the severance letter stating that her termination was a mutual decision. Plaintiff claimed she expressly told Ford, "I would never quit."

¶ 10     After interviewing plaintiff, the claims adjudicator notified Ford that plaintiff claimed she did not resign. In rebuttal, Ford maintained plaintiff had resigned. Ford told the claims adjudicator that she called plaintiff into the office to discuss plaintiff's performance. Plaintiff then told Ford that, if Ford had called her in to terminate her, plaintiff could "save [Ford] the trouble. She was resigning."

¶ 11     Ford also sent the claims adjudicator a letter from Foster detailing Foster's account of their February 1 meeting. Foster stated that she and Ford met with plaintiff to discuss the remediation plan. Plaintiff told them that she had not looked at the plan and had not been happy there for

months. Ford then explained the expectations for employee conduct to plaintiff. Foster stated in her letter that plaintiff "became visibly agitated with the discussion and abruptly stated, 'if the point of this meeting is to fire me, I will save you the effort.' " Foster stated that Ford agreed with plaintiff's decision, and plaintiff then left the office stating, "this is the happiest day of my life."

¶ 12    The claims adjudicator issued a written determination finding that plaintiff voluntarily left her employment at the Center because she considered the working conditions hazardous or unsatisfactory. The adjudicator specifically found that, during the disciplinary meeting concerning plaintiff's work performance, plaintiff resigned because she was unhappy with her current position. The adjudicator further found that, because the Center did not have the ability to control such conditions or acts, plaintiff left work voluntarily without good cause attributable to her employer. Consequently, the adjudicator concluded that plaintiff was ineligible for unemployment insurance benefits under section 601(A) of the Unemployment Insurance Act (Act) (820 ILCS 405/601(A) (West 2022)). The adjudicator noted that, based on the determination that plaintiff had voluntarily left her job, plaintiff could not be found ineligible for benefits due to misconduct under section 602(A) of the Act.

¶ 13    Plaintiff filed a written request for reconsideration of the claims adjudicator's decision and an appeal to the Department referee. Plaintiff maintained that at the February 1 meeting she "clearly stated 'I WOULD NEVER QUIT!' " She stated that she would never leave a part-time job that paid $60 an hour. Plaintiff suspected Ford or Foster recorded the February 1 meeting and claimed the recording would prove she did not quit. Plaintiff stated that she refused to sign her evaluation because "it was entirely full of nonsense and lies." She acknowledged that she told Ford she did not give the evaluation a second thought because "it was ridiculous." Plaintiff stated that

she told Ford, " '[i]f you are going to end this relationship then please do it and save all of our time.' " Ford replied, " '[y]es, that's what we'll do. Go pack your things.' "

¶ 14    Plaintiff further asserted that some practices at the Center were "deceitful," and that Ford was attempting to deceive the Department regarding plaintiff's termination. Plaintiff claimed Ford hired unqualified staff and did not have enough staff to maintain safety in the classrooms. She also claimed that three young girls were "violently abused" at the Center, and when she repeatedly notified the administration, nothing was done.

¶ 15    After reconsideration, the claims adjudicator again concluded, based on the original findings and reasoning, that plaintiff was ineligible to receive benefits. Plaintiff's appeal was then filed with the Department referee for a telephone hearing.

¶ 16    Administrative law judge (ALJ) Marilyn Wood conducted a telephone hearing to consider plaintiff's appeal. Ford was unavailable and, therefore, the Center did not participate in the hearing. Plaintiff testified under oath that she was called in to meet with Ford and Foster regarding her evaluation. At that meeting, Ford said plaintiff was not a team player and did not get along with other staff members. Plaintiff believed Ford was attacking her character and "belittling" her. Plaintiff testified as follows:

"I said to her, 'If this is the direction we're going I can see,' I knew she was ready to discharge me. I said, 'Why don't you just do it now and save all of our time?' as she was insulting me. And she, her exact words were, 'Yes, that's what we'll do. Now, go pack your things.' "

¶ 17    Wood asked plaintiff to explain why she found Ford's perception of her conduct belittling. Plaintiff replied that she often told Ford she was worried about the "violent abuse" to which the

students at the Center were subjected. Plaintiff believed Ford was looking for ways to get rid of her because Ford knew bad things were happening at the Center and nothing was being done.

¶ 18     Plaintiff claimed that prior to her evaluation, everything had been "perfect," and she had great relationships with the staff, parents, and the administration. She claimed her evaluation was an unexpected "character assassination" and "absurd;" thus, she refused to sign it. Wood pointed out that Foster had made some "very positive" comments about plaintiff in the evaluation. Plaintiff claimed she had no knowledge of the positive evaluation and suspected it was placed in her file after she was fired to "defend" their termination of her.

¶ 19     Plaintiff testified that when Ford met with her to discuss her evaluation, plaintiff told Ford, "I haven't given it a second thought. I thought we had put this behind us." Plaintiff further testified that young girls at the Center were being physically abused by other students and the administration did nothing. Plaintiff confirmed that she was a mandated reporter for child abuse. She testified that she "documented everything" and reported the abuse to Ford, but she never made a report to the child abuse hotline.

¶ 20     Plaintiff testified that she said it was the happiest day of her life when Ford discharged her because she no longer had to deal with the administration's unprofessionalism and insults. She claimed it was her way of saying, "whew, you fired me, my life will go on now and I don't have to carry all this pain and worry." Plaintiff maintained that she told Ford that she would never quit.

¶ 21     ALJ Wood issued a written decision affirming the claims adjudicator's determination finding plaintiff not eligible for unemployment benefits. In her factual findings, Wood summarized plaintiff's testimony from the hearing. Wood noted that at the February 1 meeting, plaintiff told Ford that she had not given any thought to the concerns raised in the remediation plan. Wood found

that plaintiff had dismissed Ford's concerns as invalid criticism that was belittling and insulting. Wood further found that plaintiff made no effort to engage in a discussion with Ford about the future of her employment. Instead, plaintiff told Ford that she "could see where this was going" and if Ford was going to discharge her to "go ahead, and save everyone time and effort." Wood found that Ford accepted plaintiff's remarks as her resignation, to which plaintiff replied that it was "the happiest day of her life" and left.

¶ 22    Wood found that the evidence established that plaintiff was "the moving party in her separation." Wood found no evidence that Ford met with plaintiff on February 1 to discharge her. Ford met with plaintiff to discuss the remediation plan and see if plaintiff had made any changes in her conduct. Wood found that the evidence showed plaintiff refused to discuss the matter and stopped the conversation by challenging Ford to discharge her. Wood further found that plaintiff asked to be discharged by soliciting her separation, and Ford accepted plaintiff's resignation.

¶ 23    In addition, Wood found plaintiff's testimony not credible. Wood noted that plaintiff repeatedly proclaimed that she would not leave her employment because of the pay and because her presence was necessary to protect the young children from "violent abuse." However, plaintiff ignored her obligation as a mandated reporter. Wood concluded that plaintiff resigned from her employment for personal reasons without good cause attributable to her employer. Consequently, under section 601(A) of the Act, plaintiff was disqualified from receiving benefits because she voluntarily left her employment.

¶ 24    Plaintiff appealed ALJ Wood's decision to the Board. Plaintiff stated that she wanted an opportunity to clarify evidence that had already been provided because she did not believe that Wood understood the issue, comments, timeline, or magnitude of her claim. Plaintiff stated that it

was "especially difficult" having a "one-sided conversation" when the employer did not participate in the hearing. The Board gave plaintiff an opportunity to provide any additional written argument that she wished the Board to consider in her appeal. Plaintiff did not provide any further argument.

¶ 25    The Board affirmed ALJ Wood's decision finding plaintiff ineligible to receive unemployment benefits. In its written decision, the Board stated that it reviewed the record, including the transcript from the telephone hearing. It found that the record adequately set forth the evidence and that no further evidentiary proceedings were necessary.

¶ 26    In its factual findings, the Board noted that plaintiff testified that she had great relationships with the Center's staff, administration, and parents. However, the evaluation submitted with the employer's protest stated that plaintiff had undermined team morale, negatively impacted the organizational culture, and compromised the program's reputation with superfluous comments directed towards staff, parents, and students. The Board found that Ford met with plaintiff on February 1 to discuss the remediation plan and see if plaintiff had considered making any changes in her conduct. Plaintiff admitted that she did not give any thought to the remediation plan. The Board found that plaintiff refused to recognize Ford's authority and concerns and deemed them "nonsense" and "ridiculous." It further found that plaintiff refused to discuss the matter and challenged Ford "to save time and fire her."

¶ 27    Based on the evidence, the Board found that plaintiff's actions amounted to a constructive voluntary leaving which Ford accepted by telling plaintiff to pack her belongings. The Board found no evidence that Ford met with plaintiff to discharge her. The Board concluded that, because plaintiff failed to discuss the remediation plan to preserve her job and challenged Ford to fire her, plaintiff quit her job for personal reasons that were not attributable to her employer. Thus, plaintiff

acted with the intent to compel Ford to discharge her, which constituted a constructive voluntary leaving. Accordingly, pursuant to section 601(A) of the Act, plaintiff was disqualified and not eligible to receive unemployment benefits.

¶ 28 Plaintiff appealed the Board's ruling to the circuit court of Cook County. Following a hearing, the circuit court found that the Board's findings were not against the manifest weight of the evidence. The court further found that the Board's legal conclusion that plaintiff's discharge was the result of her own actions rather than an action attributable to her employer was not clearly erroneous. Hence, the circuit court affirmed the Board's decision denying plaintiff unemployment insurance benefits.

¶ 29 On appeal, plaintiff "adamantly maintains she did not quit." Plaintiff contends ALJ Wood's decision was incorrect because it was based on contradictory, false, "non-factual, non-proven information" provided by the employer. Plaintiff further argues that her comment that it was the "happiest day" should not have any bearing on the case because she made it after she was fired and ordered to leave Ford's office. Plaintiff points out that Wood erroneously referred to Ford as "Dr. Kane" twice during the telephone hearing and claims the error demonstrated that Wood confused plaintiff for Ford. Plaintiff also argues that it is not known if Wood was provided the "entire picture of the firing" including "true, proven evidence and not just unsubstantiated hearsay provided by [the] employer." Plaintiff questions whether Wood was confused and understood the information provided to her and asserts that what happened during her firing could have been more clearly understood if her employer had appeared for the telephone hearing and participated in a "round table discussion."

¶ 30    Defendants respond that plaintiff has forfeited all her arguments because she did not raise them before the Board but, instead, has raised them for the first time in this appeal. Alternatively, defendants argue that the Board correctly determined that plaintiff was not eligible for benefits because she constructively voluntarily left her employment at the Center without good cause attributable to her employer.

¶ 31    Initially, we observe that plaintiff attached to her brief a document that appears to be her self-evaluation from the Center. Plaintiff wrote on the document "my opinion before 12/2/21." This document does not appear in the record on appeal. Our administrative review is confined to the evidence that was presented before the agency, here, the Board. 735 ILCS 5/3-110 (West 2022); *Cinkus v. Village of Stickney Municipal Officers Electoral Board*, 228 Ill. 2d 200, 214 (2008). Thus, we are precluded from considering the information contained in plaintiff's document because it is not properly before this court and cannot be used to supplement the record. *Revolution Portfolio, LLC v. Beale*, 341 Ill. App. 3d 1021, 1024 (2003).

¶ 32    In addition, issues and arguments that were not presented to the administrative agency are forfeited and cannot be raised for the first time before the appellate court on administrative review. 735 ILCS 5/3-110; *Carpetland U.S.A., Inc. v. Illinois Department of Employment Security*, 201 Ill. 2d 351, 396-97 (2002). This court's review is confined to the issues, arguments and evidence that were presented before the Board. *Texaco-Cities Service Pipeline Co. v. McGaw*, 182 Ill. 2d 262, 278-79 (1998).

¶ 33    Here, the record shows that plaintiff did not raise an argument before the Board alleging that her employer provided contradictory or false information. Nor did she argue that ALJ Wood confused her with Ford or that her "happiest day" comment should have no bearing on the case.

Consequently, plaintiff forfeited these arguments, and we decline to consider them. See *Texaco-Cities*, 182 Ill. 2d at 278.

¶ 34    Plaintiff is challenging the denial of benefits by the Board, adamantly maintaining that she did not quit her job at the Center. She is, therefore, challenging the Board's decision that she constructively voluntarily left her employment.

¶ 35    Defendants respond that the Board's finding that plaintiff constructively voluntarily left her employment was not against the manifest weight of the evidence, and its determination that she left without good cause attributable to her employer was not clearly erroneous. Defendants argue that the Board correctly found that plaintiff ignored Ford's legitimate concerns about her conduct, which is contrary to the acts of an employee who wants to maintain her employment. Defendants note that plaintiff admitted that she told Ford to fire her and said it was the "happiest day of my life" when Ford did so. Defendants argue that the Board correctly found that there was no evidence that Ford intended to fire plaintiff at the February 1 meeting, and that plaintiff compelled Ford to discharge her.

¶ 36    This court reviews the final decision of the Board rather than that of the circuit court. *Petrovic v. Department of Employment Security*, 2016 IL 118562, ¶ 22. The Board's factual findings are considered *prima facie* true and correct and will not be disturbed unless they are against the manifest weight of the evidence. *520 South Michigan Avenue Associates v. Department of Employment Security*, 404 Ill. App. 3d 304, 312 (2010). Under this standard, the Board's factual findings "must stand unless 'the opposite conclusion is clearly evident.' " *Id.* at 313 (quoting *City of Belvidere v. Illinois State Labor Relations Board*, 181 Ill. 2d 191, 204 (1998)). Where the record contains any evidence that supports the Board's factual findings, they are not against the manifest

weight of the evidence and must be sustained. *Woods v. Illinois Department of Employment Security*, 2012 IL App (1st) 101639, ¶ 16.

¶ 37    It is the Board's responsibility to weigh the evidence, determine the credibility of the witnesses, and resolve conflicts in the testimony. *Hurst v. Department of Employment Security*, 393 Ill. App. 3d 323, 329 (2009). Reviewing courts are precluded from reweighing the evidence, resolving conflicts in the testimony, or evaluating the credibility of the witnesses. *Woods*, 2012 IL App (1st) 101639, ¶ 16. Nor may a reviewing court substitute its judgment for that of the Board. *520 South Michigan Avenue*, 404 Ill. App. 3d at 317. If the issue on review merely involves conflicting testimony and witness credibility, the Board's determination should be sustained. *Id.* at 318.

¶ 38    The ultimate question of whether an employee voluntarily left work without good cause attributable to her employer is a mixed question of fact and law reviewed under the clearly erroneous standard. *Lojek v. Department of Employment Security*, 2013 IL App (1st) 120679, ¶ 32. The Board's decision will be found clearly erroneous only where a review of the entire record leaves the reviewing court with a definite and firm conviction that a mistake has been made. *Id.* It is plaintiff's burden to prove that she meets the eligibility requirements for benefits. *Id.* ¶ 34.

¶ 39    Pursuant to section 601(A) of the Act, a person who leaves her job voluntarily and without good cause attributable to her employer is not eligible for unemployment insurance benefits. 820 ILCS 405/601(A) (West 2022); *Nykaza v. Department of Employment Security*, 364 Ill. App. 3d 624, 625 (2006). "Good cause results from circumstances that produce pressure to terminate employment that is both real and substantial and that would compel a reasonable person under the circumstances to act in the same manner." *Childress v. Department of Employment Security*, 405

Ill. App. 3d 939, 943 (2010). "A voluntary leaving is not attributable to the employer unless the employee's cause for leaving is within the employer's control, which may include, but is not limited to, situations in which the employer has implemented a substantial change in the employment conditions." *Lojek*, 2013 IL App (1st) 120679, ¶ 36 (citing 56 Ill. Adm. Code 2840.101(c) (2010)). In addition, "the employee must make 'a reasonable effort to resolve the cause' of her leaving 'when such effort is possible.' " *Id.* (quoting 56 Ill. Adm. Code 2840.101(b) (2010)).

¶ 40    In this case, the Board found that plaintiff "constructively" voluntarily left her employment. Where a plaintiff is solely responsible for her termination, her actions amount to a constructive voluntary leaving without good cause attributable to her employer. See *Horton v. Department of Employment Security*, 335 Ill. App. 3d 537, 541 (2002).

¶ 41    Here, the record reveals that the Board's factual findings were not against the manifest weight of the evidence. The Board's finding that there was no evidence that Ford met with plaintiff on February 1 to discharge her was supported by the record. The remediation plan indicated that plaintiff was required to comply with the recommended follow-up action by February 2. The plan explicitly stated, "[w]e want you to remain employed at this program." Plaintiff's performance review indicated that she met nearly all the Center's expectations and included several positive comments from plaintiff's supervisor, Foster. Foster commented that she looked forward "to the continuous growth you will have in this position."

¶ 42    The evidence further showed that Ford and Foster told the claims adjudicator that they met with plaintiff to discuss the remediation plan and plaintiff's performance. In addition, plaintiff testified at the telephone hearing that she was called in to meet with Ford and Foster to discuss her

evaluation. The evidence thereby established that Ford, Foster, and plaintiff all agreed that the purpose of the February 1 meeting was to discuss plaintiff's follow-up with the remediation plan. There was no evidence that Ford had any intent to discharge plaintiff at that meeting.

¶ 43 The evidence further supported the Board's factual findings that plaintiff refused to recognize and discuss Ford's legitimate concerns, deeming them "nonsense" and "ridiculous," and challenged Ford "to save time and fire her." Ford noted on the remediation plan and stated in the severance letter that, during their February 1 meeting, plaintiff stated that she did not agree with her evaluation and, therefore, spent no time reflecting on it to implement change. Ford further stated in the severance letter that, "[u]pon explaining that you failed to meet the expectations within the remediation plan you stated that you have not been 'happy here in months and would happily resign.' I am in complete agreement with that decision." Ford also told the claims adjudicator that during the meeting, plaintiff told Ford that, if Ford had called her in to terminate her, plaintiff could "save [Ford] the trouble. She was resigning."

¶ 44 Foster's account of the meeting also supported the Board's finding. Foster stated that plaintiff told them she had not looked at the remediation plan and had not been happy there for months. Foster stated that, when Ford began explaining the expectations for employee conduct, plaintiff "became visibly agitated with the discussion and abruptly stated, 'if the point of this meeting is to fire me, I will save you the effort.' " Foster stated that Ford agreed with plaintiff's decision, and plaintiff then left the office stating, "this is the happiest day of my life."

¶ 45 Significantly, the record shows that plaintiff's own admissions and testimony supported the Board's finding that she challenged Ford to discharge her. Plaintiff admitted to the claims adjudicator that she told Ford that she did not give a second thought to the remediation plan.

Plaintiff told the adjudicator that when Ford began discussing how plaintiff related to other people, "I told her if she was trying to get rid of me, don't waste her time." Plaintiff claimed Ford then said that was "what she was going to do," and plaintiff responded that it was the happiest day of her life. In her written request for reconsideration of the claims adjudicator's denial, plaintiff acknowledged that she told Ford she did not give the evaluation a second thought because it was "ridiculous." Plaintiff further stated that she told Ford, " '[i]f you are going to end this relationship then please do it and save all of our time.' " Ford then replied, " '[y]es, that's what we'll do. Go pack your things.' "

¶ 46    Consistent with her prior statements, during the telephone hearing, plaintiff testified that when Ford told her at their meeting that she was not a team player and did not get along with other staff members, plaintiff responded as follows:

> "I said to her, 'If this is the direction we're going I can see,' I knew she was ready to discharge me. I said, 'Why don't you just do it now and save all of our time?' as she was insulting me. And she, her exact words were, 'Yes, that's what we'll do. Now, go pack your things.' "

¶ 47    Our review of the record thereby confirms that the evidence therein supported the Board's finding that plaintiff acted with the intent to compel Ford to discharge her, which constituted a constructive voluntary leaving without good cause attributable to her employer. *Horton*, 335 Ill. App. 3d at 541. Accordingly, the Board's determination that plaintiff was not eligible to receive unemployment benefits was not clearly erroneous. *Lojek*, 2013 IL App (1st) 120679, ¶ 32.

¶ 48    For these reasons, we affirm the final administrative decision of the Board of Review.

¶ 49    Affirmed.